STATE OF NORTH CAROLINA v. JAMES MASON GIBSON

No. 488A90

(Filed 18 December 1992)

**1. Homicide § 427 (NCI4th)— first degree murder—proximate cause—intervening causation—instructions**

There was no prejudicial error in a first degree murder prosecution where the trial court instructed the jury erroneously on intervening causation and correctly on contributing causation and concerted action. If one person inflicts a mortal wound and, before the victim dies, another person kills the victim by an independent act, the former cannot be properly convicted of murder; however, if the same two people acted in concert to kill another according to an agreement among themselves, they both may be properly held accountable for the murder. Here, defendant was convicted of the separate offenses of conspiracy to commit first degree murder and robbery with a dangerous weapon in addition to first degree murder. It is logically implausible that the jury could have found that defendant acted independently for the purpose of the first degree murder, while, on the same facts, it found an agreement between defendant and a co-conspirator in convicting defendant on the conspiracy to murder charge. The erroneous instruction on intervening causation was obviated and rendered harmless because it can be conclusively determined that the jury did not base its decision on the challenged instruction.

**Am Jur 2d, Homicide §§ 34, 36, 37.**

**2. Homicide § 136 (NCI4th)— first degree murder—short form indictment—instruction on assault refused—no error**

The trial court did not err in a first degree murder prosecution by refusing to give an instruction on the lesser included offense of assault where defendant was charged with a short form indictment, alleging that he did "unlawfully, willfully and feloniously and of malice aforethought . . . kill and murder Russell Allan Kelly." A murder indictment such as this does not specify a murder accomplished by assault and will not support a verdict of guilty of assault, assault inflicting serious injury, or assault with intent to kill. Although the State has

STATE v. GIBSON

[333 N.C. 29 (1992)]

the exclusive power to word the indictment and may deprive defendant of the opportunity to have the jury consider a lesser included offense, the State takes a risk in using the short form indictment because the State is prohibited on double jeopardy principles from retrying the defendant on the lesser included crimes if the defendant is pronounced not guilty on the indicted offense and set free.

**Am Jur 2d, Homicide §§ 216, 535, 544.**

**3. Evidence and Witnesses § 1619 (NCI4th) — audio tape recording — references to other crimes — references not excluded — harmless error**

Any error was harmless where the trial court in a murder prosecution allowed into evidence unedited audio tape and a transcript of conversations in which defendant confessed to the crime and made reference to having committed other murders in the past. Although the trial court here did not conduct the required *voir dire* to rule on questions of admissibility and order the tape edited or redacted as necessary, the statements by defendant were admissible because they tended to refute defendant's contention that defendant was acting under duress through fear of retaliation. Even assuming that the evidence served no purpose other than to show defendant's propensity to commit murder or that the danger of undue prejudice outweighed the probative value, any error was harmless because the State introduced overwhelming, competent evidence that defendant planned the murder with his co-conspirator, shot the victim twice, helped chain and sink the victim in a river, and then robbed the victim and deposited the money into a bank account.

**Am Jur 2d, Evidence §§ 535, 538.**

**4. Evidence and Witnesses § 1619 (NCI4th) — audio tape recording — references to other acts — not edited out — harmless error**

There was no prejudicial error in a murder prosecution where the court admitted an unedited audio recording and transcript in which defendant described, with a racial epithet, an act of fellatio which had been performed on him. Given defendant's introduction of the comment, "I hate to admit it but . . ." and the surreptitious nature of the sexual act he

describes, the jury could reasonably infer that defendant trusted Darnell, the person with whom he spoke, to safeguard his confidences and that in defendant's mind it was safe to be truthful about his involvement in the murder. However, assuming error, there was no reasonable possibility of a different verdict and no prejudice in light of the strength of the evidence of defendant's guilt. N.C.G.S. § 8C-1, Rule 404(b).

**Am Jur 2d, Evidence § 650.**

**5. Evidence and Witnesses § 2898.5 (NCI4th) — cross-examination of defendant — prior convictions — no error**

There was no error in a murder prosecution in the cross-examination of defendant regarding prior convictions where the record contained no indication of bad faith on the part of the prosecutor. The basis for the second question was provided by defendant and was in evidence through a taped conversation involving defendant and, even assuming error with respect to a portion of the first question, there was no possibility of undue prejudice in light of defendant's denial and the overwhelming body and weight of relevant evidence presented by the State. N.C.G.S. § 8C-1, Rule 609(a).

**Am Jur 2d, Witnesses §§ 830, 834-836.**

**6. Evidence and Witnesses § 2845 (NCI4th) — present recollection refreshed — use of notes — foundation — insufficient recollection**

The trial court did not err in a murder prosecution by allowing a State's witness to use notes he made immediately following his first conversation with defendant. Although defendant contended that the testimony violated N.C.G.S. § 8C-1, Rule 612 because the State failed to provide a foundation for the use of the notes, the contention that Rule 612 requires a witness to establish a foundation for the use of notes to refresh his memory is without merit. Rule 612 stands for nothing other than the requirement that an adverse party is entitled to production of the writing or object which a witness uses to refresh his or her memory. The statute nowhere imposes the requirement that the witness state that he cannot sufficiently recall a matter before he may use the writing.

**Am Jur 2d, Witnesses §§ 773, 786.**

STATE v. GIBSON

[333 N.C. 29 (1992)]

7. **Evidence and Witnesses § 2845 (NCI4th)— present recollection refreshed—use of notes—foundation—insufficient recollection**

There was no error in a murder prosecution where a State's witness was allowed to refer to notes made following his first conversation with defendant. Although defendant contended that the witness's use of notes while testifying violated N.C.G.S. § 8C-1, Rule 803(5) because the witness failed to show an inability to remember the conversation recorded in the notes, the witness's use of notes during his testimony falls under the category of "present recollection refreshed" and the foundational questions raised by "past recollection recorded" are never reached.

**Am Jur 2d, Witnesses §§ 773, 786.**

8. **Conspiracy § 14 (NCI4th)— conspiracy to murder—charge against co-conspirator dismissed—not an acquittal**

A murder defendant's conspiracy conviction was not set aside where the charge against the only co-conspirator was subsequently dismissed pursuant to a plea bargain. Dismissal of a charge pursuant to a plea agreement does not constitute an acquittal, which would have required that defendant's conviction be set aside.

**Am Jur 2d, Conspiracy §§ 24-26.**

**Prosecution or conviction of one conspirator as affected by disposition of case against coconspirators. 19 ALR4th 192.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Currin, J., at the 12 March 1990 Criminal Session of Superior Court, Duplin County, upon a jury verdict finding defendant guilty of first-degree murder, robbery with a dangerous weapon, and conspiracy to commit murder and robbery with a dangerous weapon. Defendant's motion to bypass the Court of Appeals as to his convictions of robbery with a dangerous weapon and conspiracy to commit murder and robbery with a dangerous weapon was allowed by this Court on 30 April 1991. Heard in the Supreme Court on 13 May 1992.

## STATE v. GIBSON

[333 N.C. 29 (1992)]

*Lacy H. Thornburg, Attorney General, by G. Lawrence Reeves, Jr., Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 8 January 1990 for one count of first-degree murder, one count of robbery with a dangerous weapon, and one count of conspiracy to commit murder and robbery with a dangerous weapon. The cases came on for joint capital trial at the 12 March 1990 Criminal Session of Superior Court, Duplin County.

On 29 March 1990 the jury returned verdicts of guilty as charged on all counts, and, following a sentencing hearing, recommended a sentence of life imprisonment for the first-degree murder. Defendant was sentenced to consecutive terms of life imprisonment for first-degree murder, forty years imprisonment for robbery with a dangerous weapon, and ten years imprisonment for conspiracy to commit murder and robbery with a dangerous weapon. Upon consideration of all assignments of error, we find no prejudicial error.

The evidence at trial showed that on 2 July 1989, Douglas Coffey was boating on the Neuse River with his father and seven-year-old son when he found a decomposing naked body with a chain around its waist floating face down in the river. The body of the victim, Russell Allan Kelly, had a number of tattoos on it and one of the hands was missing a little finger.

The evidence further showed that at a Halloween party in October 1988, the defendant met Larry Darnell, a tattoo artist, known to his friends as "Wizard" because he studied various forms of parapsychology, including numerology, palm reading, tarot cards, fortune telling, and ESP. Between October 1988 and June 1989 defendant visited Darnell several times for tattoos and once for Darnell to do a numerology chart on him. Darnell knew defendant by the nickname "Jibo."

In early summer 1989, defendant had a series of conversations with Darnell about the possibility of selling his Harley-Davidson motorcycle to Darnell. Defendant told Darnell he had traded a Chevelle and some money for the motorcycle. A week or so later, defendant asked Darnell if he was interested in trading some tattoo

equipment for a Chevelle. Remembering that defendant had earlier said he had traded the Chevelle for the motorcycle he was trying to sell, Darnell asked defendant how he had both the motorcycle and the car. Defendant responded, "I had to do a dirty deed." Defendant then told Darnell he had shot a guy who was a Marine.

Darnell went home and saw a newscast reporting that a body had been found in the Neuse River. He pondered the matter, then called the police and told them he might know who had killed the person whose body had been found. Darnell told an officer that he would try to get some information from defendant. There followed a series of conversations between Darnell and defendant in which Darnell induced defendant to confess to the crimes in full detail. Darnell told defendant of dreams he had had about a murder. He insinuated details provided to him by the police to build defendant's confidence in his psychic powers. He warned defendant to "watch his back" for fear of "Bob," the ex-Marine with whom defendant acted in concert in the murder. Darnell even promised to kill Bob himself if Bob killed defendant, and further boosted his credibility by saying he had killed two other people previously.

Feeling befriended, defendant told Darnell how he and Bob Jennings, a "crazy Virginia hillbilly," had planned the murder over two weeks prior to committing it and how they carried it out. A friend of Jennings' named Russell Kelly was due to be discharged from the Marines with a lot of money. Jennings and Kelly came to defendant's trailer and the three of them went out in a van, supposedly to buy three motorcycles. On a given signal, defendant was to say that he had to stop to urinate. Defendant sat between Kelly and Jennings so Kelly had to get out of the van to let defendant out. Defendant told Darnell that they did stop the van and that as Kelly got out, defendant shot him with a .357 magnum pistol.

The defendant went on to say that he "freaked out" when Kelly said, "Oh, God, he shot me." At that point, Jennings yelled to defendant to shoot Kelly again, and defendant shot the victim a second time. Defendant got out of the van and stood over Kelly. Jennings also jumped out of the van, grabbed the gun from defendant and told defendant to get Kelly's gun. Defendant said he was concerned that Jennings might shoot him and take all the money, but Jennings placed the gun at Kelly's head at point blank range and pulled the trigger.

Jennings and defendant cut the victim's clothes off, wrapped an old logging chain around his waist and ankles, and dumped the body into the river. They then drove back to defendant's trailer where they washed out the blood, dismantled the gun and drove over the gun barrel. Defendant shot the lock off of Kelly's briefcase and found $6000. They found $250 in the victim's clothing. Defendant also admitted he "must have blowed [the victim's left] little finger off."

A few days after this confession, the police asked Darnell if he would be willing to wear a "wire" and set up another conversation with defendant. Darnell did so, and the State introduced at trial a taped recording of defendant's confession, which was essentially the same as his previous statement. According to the transcript of the taped conversation, defendant told Darnell, "I pulled the . . . hammer back and shot [him] in the head and I'm not too proud of it."

An autopsy of the victim showed two gunshot wounds, one to the chest and one to the left cheek. Most of the tissue of the left little finger was missing. The experts at trial agreed that the wound to the head would have killed the victim within at least a few minutes. There was expert testimony that the victim might have survived the chest wound alone with medical care, but that it probably would have been fatal without medical care.

Dr. Victor Mallenbaum, a clinical psychologist, testified that defendant, a Native American, suffered from alcoholism, "schizotypal personality disorder," a severe neurosis, and had a borderline I.Q. of 77. He also opined that defendant was intellectually capable of fully understanding his actions.

I.

[1] The defendant's first assignment of error concerns the jury instructions given by the trial court regarding proximate cause as it relates to first-degree premeditated and deliberated murder and felony murder. The trial judge instructed the jury on two theories: (1) intervening causation, which defendant challenges in this assignment of error; and (2) contributing causation and concerted action, which is not contested. In essence, defendant contends that based on the submission of both a proper and an improper instruction, the following principle requires this Court to find reversible error:

> Where the trial judge has submitted the case to the jury on alternative theories, one of which is determined to be erroneous and the other properly submitted, and we cannot discern from the record the theory upon which the jury relied, this Court will not assume that the jury based its verdict on the theory for which it received a proper instruction. Instead, we resolve the ambiguity in favor of the defendant.

*State v. Pakulski*, 319 N.C. 562, 574, 356 S.E.2d 319, 326 (1987). Defendant argues that the intervening causation instruction was erroneous under a long line of precedent, and that it is impossible to determine whether the jury based the conviction on the legally correct instructions regarding contributing causation and concerted action, or the challenged instruction on intervening causation. Therefore, he asserts, the instruction on intervening causation constitutes reversible error.

According to defendant, he fired two shots, one hitting Russell Kelly in the chest and the other one hitting Kelly's little finger. Immediately after these shots by defendant, Bob Jennings shot Kelly in the head from point blank range. Defendant contends that testimony of two forensic pathologists showed that Kelly survived defendant's shots, and although Kelly would have ultimately died, without medical treatment, from the chest wound inflicted by defendant, he was still alive when Jennings shot him in the head. In each set of instructions on first-degree murder and felony murder, the court first used the pattern jury instructions, N.C.P.I. — Crim. 206.10, on proximate causation and then, at the request of the prosecution and over defendant's objection, added the challenged instruction: "Furthermore, if the defendant's act would have caused the victim's death, but for the intervening act of another, then the defendant's act was a proximate cause of the victim's death."

The defendant contends that the rule in this state as it applies to this case is that the conduct of the "independent intervenor," Jennings, terminated the criminal liability of the first assailant, defendant. Thus, by giving the challenged intervening causation instruction in addition to the correct pattern instruction regarding principles of contributing causation and concerted action, the trial court erroneously permitted the jury to find proximate causation even if it found that defendant acted alone in shooting Kelly and that Jennings' conduct was an independent, intervening cause of death. Defendant cites a 19th century case and its progeny as

support for his assertion that the "intervening act" instruction used in the instant case incorrectly stated the law. In that case, the trial court had given substantially the same instruction to the jury as in the present case and this Court stated:

> If one man inflicts a mortal wound, of which the victim is languishing, and then a second kills the deceased by an *independent act*, we cannot imagine how the first can be said to have killed him, without involving the absurdity of saying that the deceased was killed twice. In such a case, the two persons could not be indicted as joint murderers, because there was *no understanding, or connection between them.*

*State v. Scates*, 50 N.C. (5 Jones) 420, 423-24 (1858) (emphasis added). As stated, we agree with defendant that this is the correct statement of the law and that the instruction given was erroneous. However, we do not agree that the error warrants reversal.

We would be compelled to reverse the first-degree murder conviction if the erroneous instruction had been the only instruction given on proximate cause, or if there was insufficient evidence to support a conviction based on the other instruction, or if we were unable to determine which instruction the jury followed in reaching its verdict. However, since the erroneous instruction was not the only instruction given, and as there was sufficient evidence regarding contributing causation and concerted action, we direct our attention to whether it can be conclusively established that the jury's decision was not based on the erroneous instruction.

As noted above in *Scates*, if one person inflicts a mortal wound, and before the victim dies, another person kills him by an independent act, the former cannot be properly convicted of murder. However, if the same two people had acted in concert to kill another according to an agreement among themselves, they both may be properly held accountable for the murder. Here, in addition to first-degree murder, defendant was also convicted by the same jury on the separate offense of conspiracy to commit first-degree murder and robbery with a dangerous weapon. By definition, conspiracy is an *agreement* to commit a crime. In order to find defendant guilty of conspiracy, the jury must necessarily have rejected any assertion that defendant and his cohort, Bob Jennings, acted without agreement. It is logically implausible that the jury could have found that defendant acted independently for the purpose of the first-degree murder conviction while, on the same facts, it found an

agreement between defendant and a co-conspirator in convicting defendant on the conspiracy to murder charge. Thus, defendant's argument that it is impossible to determine on which theory the jury based the first-degree murder verdict is without merit. Since we are able to conclusively determine that the jury did not base its decision on the challenged instruction, but rather on the proper instruction, i.e., the theories of contributing causation and concerted action, we hold the error here was obviated and harmless.

## II.

[2]    The defendant's second assignment of error is the trial court's denial of his request for a jury instruction on the lesser included offense of assault with a deadly weapon inflicting serious bodily injury. Defendant was charged in this case by way of a short-form murder indictment, alleging that he did "unlawfully, willfully and feloniously and of malice aforethought . . . kill and murder Russell Allan Kelly." As discussed above, defendant contends that the gunshot wounds he inflicted on Kelly were shown at trial not to be the proximate cause of Kelly's death. Moreover, defendant testified at trial that he did not want to kill Kelly, that he shot Kelly under duress in fear of disobeying orders from Jennings, and that he aimed to wound Kelly rather than to kill him. According to defendant, this evidence was sufficient to support the lesser included offense of assault with a deadly weapon inflicting serious injury.

It is well established under North Carolina law that a trial court has the duty to instruct a jury on all lesser included offenses supported by the evidence. *State v. Fisher*, 318 N.C. 512, 350 S.E.2d 334 (1986). However, in *State v. Whiteside*, 325 N.C. 389, 383 S.E.2d 911 (1989), this Court held that an indictment charging "that defendant 'unlawfully, willfully, and feloniously and of malice aforethought did kill and murder [the victim]' is insufficient to support a verdict of guilty of assault, assault inflicting serious injury or assault with intent to kill" because such murder indictment does not specify a murder accomplished by assault. 325 N.C. at 403, 383 S.E.2d at 919.

Defendant urges this Court to reconsider the holding in *Whiteside*. He contends that although the case on which *Whiteside* relies for precedent, *State v. Rorie*, 252 N.C. 579, 114 S.E.2d 223 (1960), is good authority, this Court misapplied *Rorie* in *Whiteside*. In *Rorie*, the defendant was charged on a short-form murder indictment but was convicted of the lesser included assault offense. The defendant appealed saying that he could not be convicted of an

STATE v. GIBSON

[333 N.C. 29 (1992)]

offense for which he had not been charged. This Court agreed. In *Whiteside*, the roles of the parties were reversed. As in this case, the defendant desired the opportunity to be convicted of the lesser offense, but the court refused to give the requested instruction because the short-form murder indictment did not include the lesser offense. In the case *sub judice*, defendant argues that the rationale of evenhandedly limiting defendant to the indictment, as it had limited the State, resulted in unfairness in this instance since the State, not defendant, has the exclusive power to word the indictment. Defendant contends that this power should not be turned into a weapon to deprive him of the opportunity to have the jury consider a lesser included offense, putting him at the mercy of the prosecutor's drafting decision.

The simple truth is that under our jurisprudence defendant *is* subject to the decision of the District Attorney regarding the crime with which he will be charged. The State takes a risk in using the short-form indictment; if the evidence is insufficient to sustain a verdict of guilty of the crime on which the defendant is indicted, the defendant is pronounced not guilty and set free. In that event, the State is prohibited on double jeopardy principles from retrying the defendant on the lesser included crimes. The defendant can no more dictate what charges he will be indicted on than he can prescribe what evidence the State will introduce at trial. Moreover, it is fundamental to due process that a defendant cannot be convicted of a crime with which he has not been charged. We therefore stand by our holding in *Whiteside* and find no error in the trial court's refusal to give the jury an instruction on the contended lesser included offense.

III.

[3] The third issue defendant raises on this appeal is based on a motion *in limine* made by defense counsel to exclude certain portions of the tape and transcript of the conversations between Larry Darnell and defendant. Defendant asserts in his brief that these statements should have been excluded under Rules 404(b) and 403. By allowing the statements to come into evidence by way of unedited tape and transcript, defendant argues that the aforementioned statements would constitute a denial of due process under both the State and Federal Constitutions, and further the probative value of the statements would be substantially outweighed by their prejudicial effect.

In those conversations, defendant made reference to having committed other murders in the past, having an act of fellatio performed on him, and having burned a building. We note that the evidence concerning the burning of a building by defendant was not discussed in defendant's brief, nor did he raise it in oral argument before this Court. We therefore consider this portion to have been abandoned, and we do not address this evidence herein. N.C. R. App. P. 28(b)(5). The tape recording, including the portions covered in the motion, was played to the jury and copies of a transcript of the tape were published to the jury.

## A.

We begin our discussion of this issue by addressing the trial court's refusal to allow a tape recording to be edited to delete certain statements of defendant as to prior killings by him and asserted to be inadmissible or prejudicial. In response to defense counsel's proposal to edit the tape recording to delete any such material the trial court stated:

THE COURT: Well, let me just say, counsel, years ago I was involved in the prosecution of I don't know how many cases involving — all of which were taped, a lot of taped cases. I don't recall us ever striking any particular line from the tape.

In other words, we played the tape in its entirety. As I recall there were a few things in the tapes that was [sic] sort of off the wall, but nonetheless, we did not go through and edit the tapes.

So my general feeling would be that we would play the entire tape.

The trial court subsequently denied defendant's motion *in limine* having considered it and weighed it in light of Rule 403, finding that the probative value would outweigh any prejudicial effect.

Under the ruling of this Court in *State v. Lynch*, 279 N.C. 1, 181 S.E.2d 561 (1971), once the requisite foundation for introducing taped evidence has been established, it is necessary to delete any improper or inadmissible material before publishing the tape to the jury. According to *Lynch*:

Upon an objection to the introduction of a recorded statement, in order to ascertain if it meets the foregoing requirements, the trial judge must necessarily conduct a *voir*

*dire* and listen to the recording in the absence of the jury. "In this way he can decide whether it is sufficiently audible, intelligible, not obviously fragmented, *and, also of considerable importance, whether it contains any improper and prejudicial matter which ought to be deleted." State v. Driver,* 38 N.J. 255, 288, 183 A.2d 655, 672 [1962]. This procedure affords counsel the opportunity to object to any portions of the recording which he deems incompetent and *permits incompetent matter to be kept from the jury in some appropriate manner.*

*Id.* at 17-18, 181 S.E.2d at 571 (emphasis added).

The defendant is correct in his contention that although N.C.G.S. § 8C-1, Rule 901 relaxed the criteria for establishing authenticity of a tape recording as a threshold issue (*See State v. Stager,* 329 N.C. 278, 406 S.E.2d 876 (1991) ), *Lynch* clearly continues to govern the issue of deleting improper material from a tape before it is played to a jury. *State v. Kamtsiklis,* 94 N.C. App. 250, 257, 380 S.E.2d 400, 403, *appeal dismissed, disc. rev. denied,* 325 N.C. 711, 388 S.E.2d 466 (1989). The rule in *Lynch* supports the purpose of our Rules of Evidence to keep out irrelevant, prejudicial or otherwise inadmissible material. We therefore reaffirm the holdings in *Lynch* and *Kamtsiklis* which require the trial court to conduct a *voir dire,* rule on all questions of admissibility and order the tape to be edited or redacted as necessary. However, while it was error for the trial judge not to conduct a *voir dire,* we hold that the substance of the tape was admissible.

Returning to the substance of the present issue, we note that under N.C.G.S. § 8C-1, Rule 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes . . . ." Our cases have held that "evidence of other offenses is admissible so long as it is relevant to any fact or issue other than the character of the accused. *State v. Weaver,* 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986) (quoting 1 Brandis on North Carolina Evidence § 91 (2d rev. ed. 1982) )." *State v. Bagley,* 321 N.C. 201, 206, 362 S.E.2d 244, 247 (1987), *cert. denied,* 485 U.S. 1036, 99 L. Ed. 2d 912 (1988). Rule 404(b) is a general rule of inclusion of such evidence. *State v. Coffey,* 326 N.C. 268, 389 S.E.2d 48 (1990).

The portion of the transcript of the tape recording concerning prior killings reads as follows:

STATE v. GIBSON

[333 N.C. 29 (1992)]

GIBSON: Bobby asked me, he said, how many, how many times have you done it like this I said this is my first time . . .

DARNELL: Yeah.

GIBSON: I've strangled . . . and put a blanket over their . . . head and choke them to death or knocked them in the . . . brains with a . . . ball pean [sic] hammer or something and killed them like that. I ain't never point blank shot nobody and . . .

DARNELL: Ever run over a guy with a car?

GIBSON: Oh yeah, I did two years and six months in Canyon City, Coloroda [sic].

The challenged evidence obviously tends to demonstrate defendant's propensity to commit murder. However, under our cases, "even though evidence may tend to show other crimes, wrongs, or acts by the defendant and his propensity to commit them, it is admissible under Rule 404(b) so long as it also 'is relevant for some purpose *other than* to show that defendant has the propensity for the type of conduct for which he is being tried.' " *Coffey*, 326 N.C. at 279, 389 S.E.2d at 54 (quoting *Bagley*, 321 N.C. at 206, 362 S.E.2d at 247).

The statements by defendant are admissible in this case because they tend to refute defendant's contention that defendant was acting under duress through fear of Bob Jennings' retaliation when he shot the victim. In so refuting defendant's contention and defense of duress and fear, these statements relate directly to defendant's state of mind and thus necessarily bear upon and forcefully support key elements of the primary offense charged: malice with specific intent to kill and premeditation and deliberation. *State v. Mitchell*, 288 N.C. 360, 218 S.E.2d 332 (1975), *sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976); *State v. Hamby*, 276 N.C. 674, 174 S.E.2d 385 (1970), *sentence vacated*, 408 U.S. 937, 33 L. Ed. 2d 754, *on remand*, 281 N.C. 743, 191 S.E.2d 66 (1972). These statements in such context clearly relate to "intent" and "preparation" and therefore fall within the inclusionary portion of Rule 404(b). Certainly a boastful recitation of killing other people by strangling, choking or "knock[ing] them in the . . . brains with a . . . hammer" belies any duress or capacity to be coerced.

The primary offense for which defendant was tried was first-degree murder based upon premeditation and deliberation. In response to defendant's testimony concerning duress, premeditation and deliberation necessarily became a strongly contested issue at trial. Therefore, the State was entitled to present evidence on those issues. "Ordinarily, premeditation and deliberation must be proved by circumstantial evidence," which can include the statements of the defendant made after the killing. *State v. Saunders*, 317 N.C. 308, 312-13, 345 S.E.2d 212, 215 (1986). In the instant case, defendant's statements about prior crimes, made less than two weeks after the murder, strongly enhance the State's evidence of specific intent to kill and premeditation and deliberation because they tend to directly refute defendant's contention that he feared Jennings or acted only under duress. Larry Darnell and defendant had a relationship of trust and confidence, as shown by defendant's detailed, repeated confessions to Darnell of the crimes at issue in this case. Defendant had every opportunity to relate to Darnell his fear of Bob Jennings as a circumstance under which these crimes were committed. Instead, he exudes a reminiscence of his exploits in killing without any indication of intimidation or duress in connection with the crimes here at issue. The challenged evidence is thus admissible under the exception in, or inclusionary portion of, Rule 404(b) for evidence tending to prove some aspect of the State's case other than character or propensity to commit the crimes at issue.

Although we have concluded that the tape recorded statements regarding defendant's prior crimes are admissible under Rule 404(b), we are required to determine under Rule 403 whether the probative value of the statements outweighs their prejudicial effect.

Although admissible under Rule 404(b), the probative value of this evidence must still outweigh the danger of undue prejudice to the defendant to be admissible under Rule 403. *State v. Frazier*, 319 N.C. 388, 390, 354 S.E. 2d 475, 477 (1987). This issue is a "matter within the sound discretion of the trial court, 'and his ruling may be reversed for an abuse of discretion only upon a showing that it "was so arbitrary that it could not have been the result of a reasoned decision." ' " *State v. Jones*, 89 N.C. App. 584, 594, 367 S.E.2d 139, 145 (1988) (citations omitted).

STATE v. GIBSON

[333 N.C. 29 (1992)]

*State v. Everhardt*, 96 N.C. App. 1, 18, 384 S.E.2d 562, 572 (1989), *aff'd on other grounds*, 326 N.C. 52, 389 S.E.2d 99 (1990). The standard for this "ultimate test of admissibility is whether [the prior incidents] are sufficiently similar and not so remote as to run afoul of the balancing test between probative value and prejudicial effect set out in Rule 403. *State v. Richardson*, 100 N.C. App. 240, 395 S.E.2d 143, *disc. rev. denied*, 327 N.C. 641, 399 S.E.2d 332 (1990); N.C. Gen. Stat. § 8C-1, Rule 403." *State v. West*, 103 N.C. App. 1, 9, 404 S.E.2d 191, 197 (1991). In our view defendant has failed to make the necessary showing of arbitrariness, given the power of the statement from defendant's own mouth that he had killed various people by sundry methods of his own volition in the past.

However, even assuming *arguendo* that this evidence serves no distinct purpose in this case other than to show defendant's propensity to commit murder, and therefore was admitted erroneously under Rule 404(b), or even that the danger of undue prejudice does outweigh the probative value of the evidence, in violation of Rule 403, any such error must necessarily be considered harmless. Defendant has the burden under N.C.G.S. § 15A-1443 of demonstrating that but for the erroneous admission of this evidence, there is a "reasonable possibility" that the jury would have reached a verdict of not guilty. In this case, the State introduced overwhelming, competent evidence at trial that defendant planned the murder with his co-conspirator two weeks prior to committing it, that he himself shot the victim twice, that he helped chain and sink the body in the river, and that he then robbed the victim and deposited the same amount of money into a bank account. Thus defendant fails to show a reasonable possibility that, in light of this entire body of evidence, the jury would have reached a different verdict had it not been for the portion of challenged evidence.

B.

[4] The second piece of evidence targeted by defendant's motion *in limine* was a portion of the taped conversation between defendant and Darnell in which defendant described, with the use of a racial epithet, an act of fellatio that had been recently performed on him. The State contends that defendant's remarks were relevant to show that defendant and Darnell were close friends and confidants, which would explain why the defendant would confide in Darnell about a matter as serious as murder.

STATE v. GIBSON

[333 N.C. 29 (1992)]

Given defendant's introduction of the comment, "I hate to admit it but . . ." and the surreptitious nature of the sexual act he describes, the jury could reasonably infer that defendant trusted Darnell to safeguard his confidences, and that it was therefore, in his mind, safe to be truthful with Darnell about his involvement in the Kelly murder. Thus, rather than pertaining exclusively to defendant's character, this statement is relevant to lend credibility to the State's confession evidence and as such is admissible under Rule 404(b). Further, in light of the predicate to the exclusionary portion of Rule 404(b)—that the evidence was offered "to show that he acted in conformity therewith," it can hardly be said that the statement of this sex act was offered to show defendant committed the murder charged by acting in conformity with whatever this act may tend to show about his character. This portion of Rule 404(b) is therefore inapplicable in this instance.

However, assuming *arguendo* error in the admission of this statement on the basis there is absolutely no correlation or similarity between the fellatio and the murder, the statement is then totally irrelevant and inadmissible on that premise. Rule 403 thus does not come into play, as there is neither relevance nor probative value to this evidence. In view of the entire body and weight of relevant evidence presented by the State against defendant "and the utter irrelevance of [the sex act] to the charges on which defendant was ultimately convicted," we conclude that the erroneous admission of this statement did not constitute prejudicial error. *State v. Fie*, 80 N.C. App. 577, 343 S.E.2d 248 (1986), *rev'd on other grounds*, 320 N.C. 626, 359 S.E.2d 774 (1987).

Further, even though, under such assumption, the admission of this evidence was erroneous, the error must be considered harmless in that defendant has failed to show under N.C.G.S. § 15A-1443 that there was a reasonable possibility that absent such evidence the jury would have reached a different verdict, given the strength of the evidence of his guilt.

We therefore conclude that defendant's third assignment of error is without merit.

IV.

[5] In his fourth assignment of error defendant asserts that the prosecutor exceeded the proper scope of inquiry under N.C.G.S. § 8C-1, Rule 609(a) in cross-examining defendant on prior convic-

tions to impeach his credibility. The record includes the following colloquy:

Q. All right, what else have you been convicted of?

A. D.U.I. a couple of times.

Q. Did you have your son with you when you were driving drunk?

MR. SMITH: Objection.

THE COURT: Overruled.

Q. Did you have your son with you when you were driving drunk?

A. Not that I recall.

Q. Well, would you remember it if you did or would you not remember it?

A. I don't think I would have him with me.

. . . .

Q. Do you remember, Mr. Gibson, in 1980 in Arapaho County, Colorado where you were convicted of reckless driving in which you attempted to run over somebody?

MR. THOMPSON: Objection, move to strike.

THE COURT: Overruled.

A. I was arrested for — convicted of D.U.I. which was involving a car accident.

Q. What were you charged with on that occasion originally?

MR. THOMPSON: Objection.

MR. ANDREWS: I withdraw it, Judge.

The standard for the scope of permissible inquiry about prior convictions for impeachment purposes, prior to the enactment in North Carolina of the Code of Evidence in 1984, was set forth in *State v. Finch*, 293 N.C. 132, 235 S.E.2d 819 (1977) as follows:

Strong policy reasons support the principle that ordinarily one may not go into the details of the crime by which the witness is being impeached. Such details unduly distract the jury from

STATE v. GIBSON

[333 N.C. 29 (1992)]

the issues properly before it, harass the witness and inject confusion into the trial of the case. Nevertheless, where a conviction has been established, a limited inquiry into the time and place of conviction and the punishment imposed is proper. Such examination, so limited in scope, permits the jury to more accurately gauge the credibility of the witness while minimizing the distraction inherent in any collateral inquiry.

293 N.C. at 141, 235 S.E.2d at 824 (citation omitted). The scope of permissible inquiry in this area was expanded by the Court in *State v. Murray*, 310 N.C. 541, 313 S.E.2d 523 (1984). In *Murray*, the Court broadened the scope to include inquiry about the circumstances of a prior conviction as long as the question was asked in good faith. The Court stated:

A criminal defendant who elects to testify in his own behalf is subject to questions relating not only to his convictions for crimes but also to prior acts of misconduct which tend to discredit his character or challenge his credibility. *State v. Foster*, 293 N.C. 674, 239 S.E.2d 449 (1977). . . . We have stated that, rather than phrasing questions only in terms of convictions, the prosecutor may ask about the circumstances of a prior conviction in the same way he would ask about any specific prior misconduct. *State v. Mack*, 282 N.C. 334, 193 S.E.2d 71 (1972). In *Mack* this Court ruled that such questions related to matters within the witness's knowledge and, when asked in good faith, were permissible. *See also State v. Lynch*, 300 N.C. 534, 268 S.E.2d 161 (1980).

*Murray*, 310 N.C. at 550-51, 313 S.E.2d at 530.

In the recent case of *State v. Garner*, 330 N.C. 273, 410 S.E.2d 861 (1991), this Court allowed questions regarding prior convictions of the defendant which extended beyond the limits of time, place and punishment, for purposes of impeachment. The ruling in *Garner* was predicated on allowable cross-examination under Rule 404(a)(1) and Rule 405(a) in that, unlike the instant case, defendant injected on direct a pertinent trait of his character and relevant specific instances of conduct. The Court in *Garner* then stated the holding was consistent with "other well-established principles of law," quoting as follows from *State v. Warren*, 327 N.C. 364, 395 S.E.2d 116 (1990):

Generally, much latitude is given counsel on cross-examination to test matters related by a witness on direct

examination. *State v. Burgin*, 313 N.C. 404, 329 S.E.2d 653 (1985). The scope of cross-examination is subject to two limitations: (1) the discretion of the trial court; and (2) the questions offered must be asked in good faith. *State v. Dawson*, 302 N.C. 581, 585, 276 S.E.2d 348, 351 (1981). Furthermore, the questions of the State on cross-examination are deemed proper unless the record discloses that the questions were asked in bad faith. *Id.* at 586, 276 S.E.2d at 352.

*Garner*, 330 N.C. at 290, 410 S.E.2d at 870.

The record in the instant case contains no indication of bad faith on the part of the prosecutor with respect to either of the two questions asked. In fact, the basis for the second question was provided by defendant and was in evidence through the taped conversation between defendant and the State's witness Darnell wherein defendant told Darnell he had served time in Colorado for running over someone with a car. Even assuming, *arguendo*, error with respect to that portion of the first question challenged, relating to defendant's son being with him when he was driving drunk, on the basis this is a totally unrelated act of misconduct, we find no possibility of undue prejudice in light of defendant's denial that his son was present and the overwhelming body and weight of relevant evidence presented by the State. We therefore find no prejudicial error in this cross-examination.

V.

[6] The defendant next contends that error was committed when the State's witness Darnell, during his testimony, was allowed to use notes he made immediately following his first conversation with defendant on 8 July 1989. Defendant argues that Darnell's testimony in this manner was in violation of both N.C.G.S. § 8C-1, Rule 612 and N.C.G.S. § 8C-1, Rule 803(5), because the State failed to provide a foundation for the use of the notes. Defendant's concentration on these two rules obfuscates the real issue which involves present recollection refreshed as discussed in *State v. Smith*, 291 N.C. 505, 231 S.E.2d 663 (1970). Both defendant and the State cite the *Smith* case for support, and we find that it controls the outcome of this issue. Defendant also points out that the trial judge did not rule on the objection by defense counsel to the witness' use of his notes. By allowing the witness to proceed with using his notes the court implicitly overruled the objection.

The portion of Rule 612 which pertains to the facts of this case states:

> If, while testifying, a witness uses a writing or object to refresh his memory, an adverse party is entitled to have the writing or object produced at the trial, hearing, or deposition in which the witness is testifying.

N.C.G.S. § 8C-1, Rule 612 (1992). Defendant's assertion that Rule 612 requires a witness to establish a foundation for the use of notes to refresh his memory is without merit. Rule 612 stands for nothing other than the requirement that an adverse party is entitled to production of the writing or object which a witness used to refresh his or her memory. Defendant interprets this rule to additionally require the witness to state that he cannot sufficiently recall a matter before he may use the writing. Nowhere does the statute impose this additional requirement. While Rule 612 has a relationship to the use of a writing to refresh one's memory, it has no bearing on the issue presented here.

[7] The defendant also contends that the witness' use of notes while testifying violated Rule 803(5) because the witness failed to show an inability to remember the conversation recorded in the notes, and thus, the State did not satisfy the foundational requirements of the rule. Rule 803(5), an exception to the hearsay rule, defines a "past recollection recorded." It states in relevant part:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly.

N.C.G.S. § 8C-1, Rule 803(5) (1992). Defendant's assertion that the proper foundation was not laid arises from the fact that the witness at no time stated that he had "insufficient recollection to enable him to testify fully and accurately," or words to that effect. We agree that the foundational requirements for the use of the notes as a "past recollection recorded" were not met. If the notes alone had been tendered and admitted into evidence, the lack of a foundational basis for admitting the notes would have constituted error. However, the notes were never proffered as evidence by the State, and this assertion is therefore without merit under the circumstances.

The witness' use of notes during his testimony in this instance falls under the category of "present recollection refreshed," and the foundational questions raised by "past recollection recorded" are never reached. In present recollection refreshed the evidence is the testimony of the witness at trial, whereas with a past recollection recorded the evidence is the writing itself. *In re Messenger*, 32 F. Supp. 490 (E.D. Pa. 1940). To establish a foundation for the introduction into evidence of a past recollection recorded, the witness, "by hypothesis, [must have] *no present recollection* of the matter contained in the writing." *United States v. Riccardi*, 174 F.2d 883, 887, *cert. denied*, 337 U.S. 941, 93 L. Ed. 1746 (1949) (emphasis added). "Under present recollection refreshed the witness' memory is refreshed or jogged through the employment of a writing, diagram, smell or even touch," and he testifies from his memory so refreshed. *State v. Corn*, 307 N.C. 79, 83, 296 S.E.2d 261, 264 (1982). "Because of the independent origin of the testimony actually elicited, the stimulation of an actual present recollection is not strictly bounded by fixed rules but, rather, is approached on a case-by-case basis looking to the peculiar facts and circumstances present." *State v. Smith*, 291 N.C. at 516, 231 S.E.2d at 670-71.

The rule in *Smith* which we hold controls the resolution of this issue states, "Where the testimony of the witness purports to be from his refreshed memory but is *clearly* a mere recitation of the refreshing memorandum, such testimony is not admissible as present recollection refreshed and should be excluded by the trial judge." *Id*. at 518, 231 S.E.2d at 671. Thus, we must determine whether the spirit of the rule of present recollection refreshed has been violated by testimony which was not the product of a refreshed memory, but clearly nothing more than a recitation of the witness' notes.

The witness was initially directed to his notes by the prosecutor. It was at that time that the witness stated that he remembered a statement defendant had made to him and that he made the notes so he "could remember exactly what happened." After further testimony the witness asked if he might look at his notes again, and following another question he said, "It's not in my notes, but it just popped into my head." The fact that the witness asked to look at his notes tends to show that prior to that moment he had not been using them. Once he looked at his notes he was apparently able to testify from his own memory. The record conclusively indicates only that the witness used his notes on more

than one occasion during this portion of his testimony. After review-ing the transcript, we cannot say that the witness' testimony was clearly a mere recitation of the notes he had before him. Thus, we find no error in that the notes did nothing more than refresh the witness' memory, and the resulting testimony was therefore admissible under the doctrine of present recollection refreshed. This assignment of error is without merit.

## VI.

[8] The defendant's final assignment of error is that his conspiracy conviction should be vacated because the conspiracy charge against his co-conspirator was subsequently dismissed in a plea agreement with the State. The general rule is that if all participants charged in a conspiracy have been legally acquitted, except the defendant, then the inconsistent charge or conviction against the sole remain-ing defendant must be set aside. *State v. Raper*, 204 N.C. 503, 504, 168 S.E. 831, 832 (1933). The logic behind this rule is that if all but one have been acquitted of conspiring with the others charged, there are none left with whom the remaining party could have agreed; without an unlawful agreement there is no conspiracy. *State v. Littlejohn*, 264 N.C. 571, 574, 142 S.E.2d 132, 134 (1965).

The defendant urges this Court to conclude that a dismissal of conspiracy charges against the only other conspirator is equivalent to an acquittal when deciding whether consistent verdicts have been rendered against co-conspirators. The Court of Appeals in *State v. Essick*, 67 N.C. App. 697, 314 S.E.2d 268 (1984) rejected essentially the same argument advanced here by defendant. In *Essick*, the defendant and two others were charged with conspiracy to sell and deliver marijuana. The charge against one co-conspirator was subsequently dropped for lack of probable cause. The other co-conspirator testified for the State at the defendant's trial, and afterwards the State accepted his no contest plea to the lesser charge of maintaining a motor vehicle for purposes of keeping controlled substances. *Id.* at 698, 314 S.E.2d at 271. The Court of Appeals held that the disposition of the charges against the two co-conspirators did not constitute a judgment of acquittal against either, and therefore, did not require reversal of the defendant's conspiracy conviction.

We find the reasoning of the Court of Appeals to be sound and equally applicable to plea agreements which result in dismissal of a conspiracy charge altogether. Simply stated, dismissal of a

charge(s) pursuant to a plea agreement does not constitute an acquittal at law. Thus, in the absence of inconsistent verdicts for the same conspiracy, i.e., where all but one of the accused in the conspiracy has received an acquittal, we will not set aside the conviction of the sole remaining conspirator. We therefore find no error as to this assignment.

NO ERROR.