STATE OF NORTH CAROLINA v. MATTHEW CHARLES GRANT

No. COA05-1295

(Filed 1 August 2006)

## 1. Appeal and Error— relevancy—standard of review

A trial court's rulings on relevancy are not discretionary and are not reviewed on appeal for abuse of discretion, but they are given great deference.

## 2. Appeal and Error— preservation of issues—motion in limine—renewal of objection

Defendant's contention that the trial court erred by denying his motion in limine was reviewed on appeal, despite his failure to renew his objections at trial. N.C.G.S. § 8C-1, Rule 103 was then presumed constitutional, and the trial court assured defendant that he did not need to renew his objections.

## 3. Evidence— other crimes or bad acts—possession of assault rifle

Testimony about defendant's possession of a modified assault rifle was relevant in a prosecution for a murder committed with a shotgun. The evidence explained why defendant was in the field where the shooting occurred, why defendant used a shotgun instead of the rifle, and defendant's motive for the shooting. Disposal of the assault rifle showed a consciousness of guilt, and testimony about modifications to the rifle corroborated other testimony.

## 4. Evidence— other crimes or bad acts—possession of pistol

A pistol that was not connected in any way to a shooting with a shotgun was not relevant in the subsequent first-degree murder prosecution and should not have been admitted. However, there was no prejudice because there was overwhelming evidence of defendant's guilt.

## 5. Evidence— other crimes or bad acts—drug dealing and robbing drug dealers—relevancy to premeditation and deliberation

Evidence that defendant robbed drug dealers and hit a drug dealer during a robbery was relevant in a first-degree murder prosecution to refute defendant's contention that the shooting was without premediation and deliberation. Evidence that de-

STATE v. GRANT

[178 N.C. App. 565 (2006)]

fendant bought and used drugs was relevant to explain his robberies of drug dealers.

**6. Evidence— other crimes or bad acts—inducing another to commit fraud—purchases of weapons—relevancy to story of crime**

Evidence that a first-degree murder defendant induced another to fraudulently fill out a pawn shop form so that he could buy a gun was relevant to how defendant acquired the murder weapon. Evidence that defendant illegally purchased another weapon was relevant to how defendant acquired that weapon, the possession of which was the motive for the shooting.

**7. Evidence— other crimes or bad acts—missing curfew—relevancy**

Evidence that a first-degree murder defendant had missed his probation curfew was part of the chain of circumstances leading to the shooting.

**8. Evidence— defendant's statements to clinical social worker—admission for rebuttal**

Testimony that a first-degree murder defendant had told a social worker (who did not fully believe him) that he had been involved in drive-by shootings was relevant to show that he could be manipulative. The testimony was elicited to rebut the social worker's testimony that defendant was impulsive.

**9. Evidence— uncharged crimes and bad acts—not unduly prejudicial**

The probative value of uncharged crimes and bad acts was not substantially outweighed by the danger of unfair prejudice in a first-degree murder prosecution where premeditation and deliberation were contested issues at trial.

**10. Evidence— defendant's conduct on probation—hearsay—door opened by defendant**

Defendant opened the door in a first-degree murder prosecution to hearsay testimony about his conduct during probation. The trial court did not err by admitting the evidence.

**11. Homicide— first-degree murder—short-form indictment—constitutionality**

The short-form indictment for first-degree murder is constitutionality.

Judge STEELMAN concurring in the result.

Appeal by defendant from judgment dated 1 December 2004 by Judge Donald W. Stephens in Superior Court, Wake County. Heard in the Court of Appeals 11 May 2006.

*Attorney General Roy Cooper, by Special Deputy Attorney General Robert C. Montgomery and Assistant Attorney General Amy C. Kunstling, for the State.*

*Nora Henry Hargrove for defendant-appellant.*

McGEE, Judge.

Matthew Charles Grant (defendant) was convicted of first degree murder on 17 November 2004. After a sentencing hearing, the trial court sentenced defendant to life imprisonment without parole on 1 December 2004. Defendant appeals.

The State's evidence at trial tended to show the following: Vanorance McQueen (McQueen) testified that defendant gave him $120.00 on 29 November 2003 and asked McQueen to purchase a firearm for him. McQueen testified that defendant wanted the gun to commit robberies. McQueen filled out the forms necessary for the purchase of a firearm but he lied on the forms by stating that he was purchasing the firearm for himself. McQueen further testified that he purchased a single shot twelve gauge shotgun (the shotgun) from a pawn shop and gave the shotgun to defendant. The shotgun was later identified as the murder weapon.

Dustin Roark (Roark) testified that in early January 2004, defendant asked him if he knew where defendant could buy a gun. Roark told defendant he knew someone who was selling a gun. Roark testified that he and defendant drove to Biscoe, North Carolina, where defendant purchased an SKS assault rifle from an individual.

Eric Hertzog (Hertzog) testified that he lived in defendant's home from December 2003 through early February 2004. Hertzog testified that he and defendant left defendant's home on the night of 1 January 2004, in violation of defendant's court-ordered curfew, to shoot defendant's shotgun. Hertzog also testified that sometime in January or early February 2004, he participated in a robbery with defendant. Defendant told him to wait in the car while defendant robbed a drug dealer. Defendant told Hertzog to point the shotgun at the drug dealer "if the drug dealer tried to do anything[.]" Hertzog testified that defendant robbed the drug dealer and that Hertzog did not have to use the shotgun. Hertzog further testified that defendant told him on

12 February 2004 that defendant had killed a police officer. Hertzog testified that he gave this information to police on 13 February 2004.

The Wake County Sheriff's Office investigated the 12 February 2004 shooting death of one of its deputies, Mark Tucker (the victim). Deputy Dennis Currin testified that on 13 February 2004, defendant was identified as a suspect in the shooting. Deputy William Harding (Deputy Harding) testified that he conducted surveillance of defendant on the night of 13 February 2004 and into the early morning hours of 14 February 2004. Deputy Harding testified that he arrested defendant for reckless driving, improper registration, and possession of marijuana. Deputy Harding transported defendant to the Wake County Public Safety Center.

Sergeant Jerry Winstead (Sergeant Winstead), of the Wake County Sheriff's Office, testified that he and Lieutenant Richard Johnson (Lieutenant Johnson) interviewed defendant at the Wake County Public Safety Center on 14 February 2004 about the shooting death of the victim. Sergeant Winstead testified that Chief Deputy Stewart entered the interview room and told them, "we got the gun." Defendant heard this statement and Lieutenant Johnson told defendant that "things [were] piling up." Sergeant Winstead told defendant "the physical evidence [was] coming in minute by minute[.]" Defendant lowered his head, pulled Sergeant Winstead's pen and notepad toward him, and wrote the following: "I didn't want to. I felt it was the only choice I had." Defendant then confessed to shooting the victim.

Sergeant Winstead further testified that defendant made the following written statement on 14 February 2004:

I had gone back to that field to shoot off the shotgun I had. I had no intention of ever using it on another person.

I backed into a spot and parked my car. Then I got out and popped the trunk and was checking out the gun and I had loaded it.

I heard a noise and when I looked up and I saw an unmarked police car coming towards me. My first thought was to just close my trunk and try to leave. But the officer pulled up in front of my car sort of and stopped.

I stayed behind my car, and when he got out I came from out behind my car with the shotgun loaded. I knew that I was going

to be in trouble either way, but I felt that I didn't—I did not have a choice.

He looked at me and started to reach for his gun but he stopped. He told me to put the gun down. I was so scared I didn't really know what to do. When he told me to put the gun down I knew that if I did, my life would be over.

I told him I can't. And it just seemed to happen so fast. I heard the gun go off. I didn't ever look to see what happened. I turned around, threw the gun in the trunk, closed it and got in my car and drove away.

I was scared to death. I asked—I was shaking all over and all I could think about was that I needed to be around people. I called up some of my friends and told them to meet me somewhere. They asked what happened and I told them.

They said they would help me hide my stuff and that . . . is what happened. I never wanted to kill anybody and I wished I could take it all back and I can't. All I can do now is take responsibility for my actions and pray that one day [the] family and God will forgive me.

Lieutenant Johnson testified that he interviewed defendant again on 15 February 2004. Defendant provided more details about the shooting. Defendant told Lieutenant Johnson that he drove to the construction site of the new YMCA building on 12 February 2004 to target shoot. Defendant said he was standing at the trunk of his car when he "saw what he thought or knew to be an unmarked police car." Defendant told Lieutenant Johnson that "there was no question in his mind that what he saw was a police car[.]"

Lieutenant Johnson testified that defendant said the victim got out of his car. Defendant said he saw the victim's badge clipped to his belt. Lieutenant Johnson further testified as follows: "[Defendant] stated that knowing that he was on probation, was not legally able to possess a firearm, that [defendant] . . . knew that [the victim] . . . had probable cause to search his car and that he was going back to jail and he didn't want to go back to jail." Lieutenant Johnson also testified that defendant stated that he raised the shotgun, and "as he raised the [shotgun], he was cocking it preparing to shoot." Defendant said he aimed at the victim's head because "[h]e didn't want to shoot through the door. He didn't know if [the shot] would penetrate." Defendant again confessed to killing

the victim. Defendant also told Lieutenant Johnson that defendant's friend, McQueen, had helped defendant acquire the shotgun, and that defendant had purchased the shotgun to "rip marijuana dealers off."

Justin Franke (Franke) and Lawson Rankin (Rankin) testified that defendant told them that on 12 February 2004, he went to a field near his house to test his new SKS assault rifle. However, defendant told Franke and Rankin that the clip on the SKS assault rifle was "messed up" and that defendant tried to fix it. Franke and Rankin testified that defendant said he could not fix the clip and decided to shoot the shotgun in the field. Defendant also told Franke and Rankin that he picked up the shotgun from the trunk and heard someone say, "son, put the gun down." Defendant told them he turned around and saw the victim standing next to a Crown Victoria. Defendant told Franke and Rankin that he shot the victim with the shotgun. Defendant also told them he shot the victim because "he was on probation for . . . car thefts and . . . possessing guns would have sent him back to jail."

Franke and Rankin also testified that defendant asked them to hide the shotgun and defendant's pistol. Defendant gave them step-by-step instructions as to how they should conceal the weapons. Franke and Rankin hid the shotgun and pistol in the woods and told defendant where they had hidden them.

Scott Varju (Varju) testified that on the evening of 12 February 2004, defendant asked him to hold defendant's SKS assault rifle. Defendant told Varju that "there [were] cops driving around his house and he didn't know why and he wanted [Varju] to hold [the SKS assault rifle][.]" Varju took the SKS assault rifle from defendant and hid it in a speaker box at Varju's home. Police recovered the SKS assault rifle from Varju's home on 18 February 2004.

Special Agent Neal Morin (Agent Morin) of the North Carolina State Bureau of Investigation testified that he was assigned to the crime laboratory in Raleigh as a firearms examiner. Agent Morin testified he examined the SKS assault rifle and determined that it had been modified in "an attempt to convert the [SKS assault] rifle to full automatic fire."

Margaret Price (Ms. Price) testified that she became defendant's probation officer in November 2003. On cross-examination, defense counsel asked Ms. Price about a report in her files as follows:

Q. Yes. And I can approach if it will speed that up. Let me show you the page I am looking at. Is this a page from your report—from your files?

A. It is.

Q. Okay. And it is. Okay. And does that indicate that there was a conversation about contact with TASK and [defendant] indicated he had an appointment for the 19th of February?

A. That's correct.

On re-direct examination, the State engaged in the following inquiry:

Q. Miss Price, your records also reflect the correspondence from Miss Brayboy at the TASK Program?

A. Yes, it does.

Q. And after [defendant's] arrest did she write you a letter detailing his participation in their TASK Program?

A. Yes, she did.

Q. And did—in that did she note that—

[DEFENSE COUNSEL]: Objection to hearsay.

THE COURT: Overruled. Is this part of your file?

[MS. PRICE]: The letter is, your Honor.

THE COURT: All right. Fine. Overruled.

BY [THE STATE]:

Q. In that did she note that on at least one occasion that he had called to reschedule one of his appointments on January the 9th?

A. That is correct. It does note that.

Q. And later on February the 11th, the day before this incident, does it reflect the call from [defendant's] father expressing concerns and wanting to talk to somebody?

[DEFENSE COUNSEL]: Objection. Hearsay.

THE COURT: Overruled. Go ahead.

BY [THE STATE]:

Q. Does it reflect that on February 11th, the day before this incident, that [defendant's] father called the TASK Program expressing some concerns and wanting to speak with them in fact delaying the process?

A. Yes, it does.

Defendant presented the following evidence at trial. Dr. Seymour Halleck (Dr. Halleck) testified as an expert in forensic psychiatry. Dr. Halleck testified that at the time of the shooting, defendant "had serious emotional problems which adversely affected his ability to plan his actions[.]" Dr. Halleck testified that defendant suffered from chronic depression, chronic low self-esteem, and an inability to handle emotion. Dr. Halleck testified defendant was terrified and in a state of panic when he shot the victim.

Dr. Halleck also testified regarding defendant's childhood. Dr. Halleck testified that both of defendant's parents "drank and smoked a great deal." Dr. Halleck testified that defendant lived with various irresponsible relatives and was neglected as a child Dr. Halleck also testified that defendant was beaten as a child and might have been sexually abused.

Dr. Halleck further testified that defendant's paternal grandparents gained custody of defendant when defendant was four years old and that defendant's paternal grandparents later adopted defendant. Dr. Halleck testified defendant was referred for an evaluation when defendant was five years old and was diagnosed as being "exceedingly anxious and depressed experiencing emotional overload bordering on psychosis." As a result, defendant received psychotherapy. The paternal grandparents eventually arranged for defendant to receive inpatient treatment from July 1999 to August 2000 at Peninsula Village, a residential treatment center for children in Tennessee. Defendant received group and individual therapy at Peninsula Village and was prescribed several medications.

Jean Bolding (Ms. Bolding) also testified for defendant as an expert in adolescent and family counseling. Ms. Bolding testified on direct examination that she was a licensed clinical social worker who was defendant's family therapist at Peninsula Village. Ms. Bolding testified that defendant was an "extremely impulsive" person.

On cross-examination, the State elicited testimony from Ms. Bolding that, while defendant was at Peninsula Village, defendant told Ms. Bolding that he had previously participated in drive-by shootings. The State also elicited testimony from Ms. Bolding that "[t]here were times where [Ms. Bolding] felt very strongly that [defendant] exaggerated his misdeeds" and that she was not certain whether defendant was telling the truth about his participation in the drive-by shootings.

I.

[1] Defendant first argues the trial court erred by denying his motion *in limine* to exclude evidence that defendant possessed an SKS assault rifle and a pistol, and that the SKS assault rifle had been modified. Defendant argues this evidence was irrelevant and any probative value was substantially outweighed by the danger of unfair prejudice.

Pursuant to North Carolina Rule of Evidence 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2005). " '[I]n a criminal case every circumstance calculated to throw any light upon the supposed crime is admissible and permissible.' " *State v. Bruton*, 344 N.C. 381, 386, 474 S.E.2d 336, 340 (1996) (quoting *State v. Collins*, 335 N.C. 729, 735, 440 S.E.2d 559, 562 (1994)). The determination of the weight of such evidence is a matter properly left to the jury. *State v. Smith*, 357 N.C. 604, 614, 588 S.E.2d 453, 460 (2003), *cert. denied, Smith v. North Carolina*, 542 U.S. 941, 159 L. Ed. 2d 819 (2004). Although a trial court's rulings on relevancy are not discretionary and we do not review them for an abuse of discretion, we give them great deference on appeal. *State v. Streckfuss*, 171 N.C. App. 81, 88, 614 S.E.2d 323, 328 (2005).

Relevant evidence may be excluded pursuant to Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2005). A trial court has discretion whether or not to exclude evidence under Rule 403, and a trial court's determination will only be disturbed upon a showing of an abuse of that discretion. *State v. Campbell*, 359 N.C.

644, 674, 617 S.E.2d 1, 20 (2005), *cert. denied, Campbell v. North Carolina,* —— U.S. ——, 164 L. Ed. 2d 523 (2006).

**[2]** Our Supreme Court has held that "[a] motion *in limine* is insufficient to preserve for appeal the question of the admissibility of evidence if the defendant fails to further object to that evidence at the time it is offered at trial." *State v. Conaway,* 339 N.C. 487, 521, 453 S.E.2d 824, 845, *cert. denied, Conaway v. North Carolina,* 516 U.S. 884, 133 L. Ed. 2d 153 (1995). However, the General Assembly amended Rule 103 of the Rules of Evidence to provide as follows: "Once the [trial] court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." N.C. Gen. Stat. § 8C-1, Rule 103(a)(2) (2005). The General Assembly made the amendment applicable to rulings made on or after 1 October 2003.

In *State v. Tutt,* 171 N.C. App. 518, 615 S.E.2d 688 (2005), our Court held that the amendment to Rule 103 was unconstitutional to the extent it was inconsistent with N.C.R. App. P. 10(b)(1). *Id.* at 524, 615 S.E.2d at 692-93. In *Tutt,* our Court held that although the defendant challenged the lineup through a motion *in limine,* the defendant failed to preserve his objection to the lineup by failing to object at trial. *Id.* at 524, 615 S.E.2d at 693. However, our Court recognized that Rule 103 was presumed constitutional at the time of the trial and invoked Rule 2 of the North Carolina Rules of Appellate Procedure to address the defendant's argument. *Id.*

In the present case, Rule 103(a)(2) was also under a presumption of constitutionality at the time of trial. *See Id.* The trial court assured defendant that he did not need to renew his objections to the evidence when it was offered at trial. Accordingly, we shall review defendant's arguments. *See Id.; see also, State v. Baublitz,* 172 N.C. App. 801, 806, 616 S.E.2d 615, 619 (2005).

**[3]** In arguing that the challenged evidence was irrelevant, defendant relies upon *State v. Wallace,* 104 N.C. App. 498, 410 S.E.2d 226 (1991), *disc. review denied,* 331 N.C. 290, 416 S.E.2d 398, *cert. denied, Wallace v. North Carolina,* 506 U.S. 915, 121 L. Ed. 2d 241 (1992) and *State v. Patterson,* 59 N.C. App. 650, 297 S.E.2d 628 (1982). In *Wallace,* the defendant was convicted of robbery with a dangerous weapon. *Wallace,* 104 N.C. App. at 499- 500, 410 S.E.2d at 227. At trial, the State introduced evidence that police found "a toboggan with holes cut out in the front like a mask[]" in the vehicle the defendant

was driving when he was arrested. *Id.* at 501, 410 S.E.2d at 228. However, the State did not contend that a mask was used in the commission of the robbery. *Id.* at 502, 410 S.E.2d at 228. Our Court held the evidence was irrelevant and inadmissible because it had "not been connected to the crime charged and . . . [had] no logical tendency to prove any fact in issue[.]" *Id.* at 502, 410 S.E.2d at 228-29. However, our Court further held: "In light of the substantial evidence of [the] defendant's guilt, we conclude that there is no reasonable possibility that the verdict returned by the jury was affected by the erroneous introduction of the toboggan testimony." *Id.* at 503, 410 S.E.2d at 229.

In *Patterson*, the defendant was convicted of armed robbery. *Patterson*, 59 N.C. App. at 651, 297 S.E.2d at 629. On cross-examination of the defendant, the State elicited testimony that there was a sawed-off shotgun in the vehicle the defendant was driving at the time of his arrest. *Id.* at 652, 297 S.E.2d at 630. However, there was no evidence that the sawed-off shotgun was used in the commission of the armed robbery. *Id.* at 653, 297 S.E.2d at 630. The State introduced into evidence a small caliber pistol and the victim identified the pistol as being very similar to the one used in the robbery. *Id.* Our Court held that the sawed-off shotgun "was not connected to the robbery and it was clearly not relevant to any issues in the case." *Id.* Our Court also held that "there [was] a reasonable possibility that the erroneous admission of the shotgun evidence contributed to the defendant's conviction, particularly in light of the conflicting evidence regarding the identity of the defendant as the man who robbed [the victim]." *Id.* at 653-54, 297 S.E.2d at 630.

The present case is distinguishable. Here, the testimony of Franke and Rankin that defendant possessed the SKS assault rifle was relevant to explain why defendant was in a field on 12 February 2004, and why defendant shot the victim with the shotgun, rather than the SKS assault rifle. The evidence was also relevant to establish defendant's motive for shooting the victim because defendant did not want the victim to discover that defendant was violating his probation by possessing firearms. Varju's testimony regarding concealment of the SKS assault rifle was relevant to show that defendant was conscious of his own guilt. Agent Morin's testimony regarding the modifications made to the SKS assault rifle corroborated the testimony of Franke and Rankin that defendant told them the clip on the SKS assault rifle was "messed up." Therefore, Agent Morin's testimony was also relevant.

Furthermore, because defendant's possession of the SKS assault rifle was highly probative of defendant's motive for shooting the victim, we conclude that the probative value of the challenged evidence was not "substantially outweighed by the danger of unfair prejudice" to defendant. *See* N.C.G.S. § 8C-1, Rule 403. Therefore, the trial court did not abuse its discretion by allowing introduction of evidence that defendant possessed the SKS assault rifle and that it had been modified.

**[4]** However, unlike the testimony concerning defendant's possession of the SKS assault rifle, the testimony that defendant possessed the pistol was irrelevant. As in *Wallace* and *Patterson*, the pistol was not connected to the shooting of the victim in any way. Nonetheless, a defendant is not prejudiced by trial errors which do not amount to constitutional violations unless "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2005). "Erroneous admission of evidence may be harmless where there is an abundance of other competent evidence to support the state's primary contentions, or where there is overwhelming evidence of [the] defendant's guilt." *State v. Weldon*, 314 N.C. 401, 411, 333 S.E.2d 701, 707 (1985) (internal citations omitted).

In the present case, there was overwhelming evidence of defendant's guilt. "Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Fleming*, 296 N.C. 559, 562, 251 S.E.2d 430, 432 (1979). "Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation." *State v. Conner*, 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994). "Deliberation does not require brooding or reflection for any appreciable length of time, but imports the execution of an intent to kill in a cool state of blood without legal provocation, and in furtherance of a fixed design." *State v. Myers*, 299 N.C. 671, 677, 263 S.E.2d 768, 772 (1980).

In this case, defendant admitted he shot the victim. Defendant admitted he shot the victim because defendant was on probation and knew he was not supposed to possess guns and did not want to go back to jail. Defendant also stated he aimed for the victim's head because he did not know if the shot would go through the car door

the victim was standing behind. Several other witnesses corroborated defendant's statements. We overrule defendant's assignments of error grouped under this argument.

## II.

Defendant next argues the trial court erred by denying his motion *in limine* to exclude evidence of uncharged crimes and bad acts committed by defendant. Defendant challenges evidence that defendant: (1) bought and used drugs, robbed drug dealers, and hit a drug dealer during a robbery; (2) induced another to fraudulently fill out a pawn shop form so that defendant could buy a gun, and bought another gun illegally; and (3) disregarded his court-imposed curfew. Defendant also challenges testimony of Ms. Bolding that defendant said he had been involved in drive-by shootings. For the reasons stated in Section I of this opinion, we review defendant's argument even though he did not raise objections when the challenged evidence was introduced at trial. *See Tutt*, 171 N.C. App. at 524, 615 S.E.2d at 693; *see also, Baublitz*, 172 N.C. App. at 806, 616 S.E.2d at 619.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2005) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

"Rule 404(b) is a rule of inclusion, subject to the single exception that such evidence must be excluded if its *only* probative value is to show that [a] defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Berry*, 356 N.C. 490, 505, 573 S.E.2d 132, 143 (2002).

**[5]** Defendant first challenges evidence that he bought and used drugs and that he robbed drug dealers and hit a drug dealer during a robbery. During opening statement, defense counsel argued defendant panicked and shot the victim; defense counsel argued the shooting was not planned. Defense counsel further stated:

Thank you. And [defendant] wrote and filed with this Court I, [defendant], hereby give my informed and voluntary consent to my lawyers to tell the jury at my murder trial, which is now set

for October 11th, 2004, that I am guilty of second degree murder. And that, ladies and gentlemen, is the question before you. What is [defendant] guilty of? And all of the evidence that you will hear that I am talking about that I am permitted to forecast will say the same thing, second degree murder.

Accordingly, premeditation and deliberation were strongly contested issues at trial.

In *State v. Gibson*, 333 N.C. 29, 424 S.E.2d 95 (1992), *overruled in part on other grounds by State v. Lynch*, 334 N.C. 402, 432 S.E.2d 349 (1993), the defendant was convicted of, *inter alia*, first degree murder. *Id.* at 33, 424 S.E.2d at 97. The defendant filed a motion *in limine*, based upon Rule 404(b) and Rule 403, to exclude certain statements made by the defendant, in which the defendant admitted to committing other murders in the past. *Id.* at 39-40, 424 S.E.2d at 101. The trial court denied the defendant's motion. *Id.* at 40, 424 S.E.2d at 101. Our Supreme Court recognized that the defendant raised the defense of duress, thereby making premeditation and deliberation contested issues in the case. *Id.* at 43, 424 S.E.2d at 103. Our Supreme Court held as follows:

> The statements by defendant are admissible in this case because they tend to refute defendant's contention that defendant was acting under duress through fear of Bob Jennings' retaliation when he shot the victim. In so refuting defendant's contention and defense of duress and fear, these statements relate directly to defendant's state of mind and thus necessarily bear upon and forcefully support key elements of the primary offense charged: malice with specific intent to kill and premeditation and deliberation. These statements in such context clearly relate to "intent" and "preparation" and therefore fall within the inclusionary portion of Rule 404(b).

*Id.* at 42, 424 S.E.2d at 102-03 (internal citations omitted).

Likewise, in this case, evidence that defendant robbed drug dealers and hit a drug dealer during a robbery was clearly relevant to refute defendant's contention that he shot the victim without premeditation and deliberation. The evidence in the present case showed that (1) defendant was capable of planning criminal conduct, (2) defendant was capable of dealing with stressful and dangerous situations, and (3) defendant was willing to use a firearm in the commission of criminal offenses. The evidence that defendant

bought and used drugs was relevant to explain defendant's robberies of drug dealers.

**[6]** Defendant next challenges evidence that he induced another to fraudulently fill out a pawn shop form so that defendant could buy a gun, and defendant also challenges evidence that he bought another gun illegally. However, in *State v. Agee*, 326 N.C. 542, 391 S.E.2d 171 (1990), our Supreme Court held as follows:

> "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."

*Id.* at 548, 391 S.E.2d at 174 (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)).

In *State v. Rannels*, 333 N.C. 644, 430 S.E.2d 254 (1993), the defendant was convicted of, *inter alia*, first degree murder. *Id.* at 649, 430 S.E.2d at 257. Pursuant to Rule 404(b), the defendant moved to suppress evidence that he stole the pistol he used to shoot the victim, and the trial court denied the motion. *Id.* at 657, 430 S.E.2d at 261. Our Supreme Court held as follows: "That defendant stole the murder weapon tends to prove not only that he possessed it but the circumstances under which he acquired it. This kind of evidence is generally admissible in a homicide prosecution as tending to prove the guilt of the accused." *Id.* at 658, 430 S.E.2d at 262.

In the present case, evidence that defendant induced McQueen to fraudulently fill out a pawn shop form so that defendant could buy a gun was relevant to show how defendant acquired the murder weapon. It was also relevant to show that defendant possessed the murder weapon. Evidence that defendant illegally purchased the SKS assault rifle was relevant to show how defendant acquired that weapon, the possession of which was defendant's motive for shooting the victim. The evidence was relevant " 'to complete the story of the crime for the jury.' " *Agee*, 326 N.C. at 548, 391 S.E.2d at 174 (quoting *Williford*, 764 F.2d at 1499).

**[7]** Defendant also challenges evidence that defendant missed his curfew. Like the evidence regarding defendant's acquisition of the shotgun and SKS assault rifle, the evidence that defendant violated his curfew was part of the chain of circumstances leading up to the

shooting. This evidence also had no tendency to show that defendant had a propensity to commit first degree murder.

[8] Defendant further challenges the testimony of Ms. Bolding, who testified on cross-examination that defendant said he had been involved in drive-by shootings. However, the State elicited this testimony on cross-examination to rebut Ms. Bolding's direct testimony that defendant was impulsive. Ms. Bolding's challenged testimony on cross-examination was relevant to show that defendant could be manipulative.

[9] We must also determine whether, pursuant to Rule 403, the trail court abused its discretion by allowing the introduction of this evidence. *See Campbell,* 359 N.C. at 674, 617 S.E.2d at 20. However, because premeditation and deliberation were contested issues at trial, we conclude the probative value of the challenged evidence was not "substantially outweighed by the danger of unfair prejudice." *See* N.C.G.S. § 8C-1, Rule 403. Therefore, the trial court did not abuse its discretion, and we overrule defendant's assignments of error grouped under this argument.

### III.

[10] Defendant next argues the trial court erred by allowing inadmissible hearsay testimony regarding defendant's conduct during probation. We first note that defendant has waived any argument that his Sixth Amendment right to confront witnesses was violated. *See State v. Gainey,* 355 N.C. 73, 87, 558 S.E.2d 463, 473, *cert. denied, Gainey v. North Carolina,* 537 U.S. 896, 154 L. Ed. 2d 165 (2002) (recognizing that "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal.").

"Hearsay is not admissible except as provided by statute or by these rules." N.C. Gen. Stat. § 8C-1, Rule 802 (2005). However, "[w]here one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." *State v. Albert,* 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981).

In *State v. Mason,* 159 N.C. App. 691, 583 S.E.2d 410 (2003), the defendant was convicted of, *inter alia,* first degree murder. *Id.* at 691, 583 S.E.2d at 411. The defendant argued the trial court erred by allowing the State to introduce prejudicial hearsay. *Id.* at 694, 583 S.E.2d at 412. Specifically, the defendant argued the trial court erred by per-

mitting a deputy to testify about a domestic violence call involving the defendant on the night of the shooting. *Id.* at 695, 583 S.E.2d at 413. However, on cross-examination of the deputy, the defendant asked the deputy about a report the deputy had written concerning the incident and the defendant inquired about the omission of certain details. *Id.* The trial court permitted the State to ask the deputy about the contents of the report on re-direct examination. *Id.* Our Court held that "[b]y raising the issue of why [the] [d]eputy . . . was called to the scene and his subsequent report on the domestic violence allegation, [the] defendant 'opened the door' to allow the State to ask similar or related questions." *Id.* Our Court held that the State's evidence was properly admitted. *Id.*

In the present case, on cross-examination of Ms. Price, defendant asked her about information in her file related to an appointment defendant had with someone at the TASK Program. By asking Ms. Price about this information in her file, defendant opened the door to re-direct examination concerning this issue. Accordingly, the trial court did not err by allowing the State to elicit hearsay testimony to explain and rebut evidence elicited about the file on defendant's cross-examination of Ms. Price. We overrule this assignment of error.

IV.

**[11]** Defendant argues the short-form indictment under which he was charged was unconstitutional because it did "not allege the elements of premeditation, deliberation or the presence of the specific intent to kill." However, defendant acknowledges that our Supreme Court has upheld the constitutionality of the short-form murder indictment. In *State v. Braxton*, 352 N.C. 158, 531 S.E.2d 428 (2000), *cert. denied, Braxton v. North Carolina*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001), the defendant argued the indictment under which he was charged was unconstitutional in that it failed to allege "premeditation, deliberation, and specific intent to kill." *Id.* at 173, 531 S.E.2d at 437. Our Supreme Court upheld the constitutionality of the short-form murder indictment and concluded that "premeditation and deliberation need not be separately alleged in the short-form indictment." *Id.* at 174-75, 531 S.E.2d at 437-38. Therefore, we overrule this assignment of error.

No error.

Judge ELMORE concurs.

Judge STEELMAN concurs with a separate opinion.

STEELMAN, Judge concurring in the result.

I fully concur in the result reached in the majority's opinion. However, I am compelled to write separately in the matter because I believe the standard of appellate review for decisions of the trial court under Rule 401 of the North Carolina Rules of Evidence as stated by the majority and the cases cited by that opinion is incorrect.

The majority states that: "Although a trial court's rulings on relevancy are not discretionary and we do not review them for an abuse of discretion, we give them great deference on appeal." The correct standard of appellate review for a trial court's determinations of relevancy under Rule 401 should be "abuse of discretion."

The concept that the standard of review is "great deference" rather than abuse of discretion first appeared in the case of *State v. Wallace*, 104 N.C. App. 498, 410 S.E.2d 226 (1991).[1] *Wallace* purports to paraphrase § 5166 of C. Wright & K. Graham, 22 Federal Practice and Procedure (1978) (hereinafter, Wright and Graham) as follows: "Thus, even though a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal." *Wallace*, 104 N.C. App. at 502, 410 S.E.2d. at 228.

"Where our rule and the federal rule are similar, we may look to the federal rule's legislative history and federal court interpretations for guidance in determining our General Assembly's intent in adopting the rule." *Crawford v. Fayez*, 112 N.C. App. 328, 333, 435 S.E.2d 545, 548 (1993). The discussion in § 5166 of Wright and Graham deals with the scope of the trial court's discretion in determining relevancy under Rule 401 of the Federal Rules of Evidence compared to what existed prior to the adoption of those rules. This is then compared

---

1. This analysis has been carried forward in numerous cases since its publication. *See, e.g., State v. Davis*, 177 N.C. App. 98, 627 S.E.2d 474 (2006); *State v. Streckfuss*, 171 N.C. App. 81, 614 S.E.2d 323 (2005); *Dunn v. Custer*, 162 N.C. App. 259, 591 S.E.2d 11 (2004); *State v. Smith*, 157 N.C. App. 493, 581 S.E.2d 448 (2003). *Contra Dep't of Transp. v. Elm Land Co.*, 163 N.C. App. 257, 267, 593 S.E.2d 131, 138, *disc. review denied*, 358 N.C. 542, 599 S.E.2d 42 (2004) (applying abuse of discretion standard of review to the trial court's determination of whether proffered evidence was relevant to the issues being tried).

with the judge's discretion to exclude evidence under Rule 403. The relevant portion of § 5166 of Wright and Graham contained in the 1978 treatise reads as follows:

> [R]ule 401 sets a standard for relevance that judges are supposed to follow. This standard does give the judge great freedom to admit evidence, but it diminishes quite substantially his authority to exclude evidence as irrelevant. Since Rule 401 restricts mandatory exclusion for irrelevance, this means that the discretionary power to exclude under Rule 403 becomes even more important. But the discretion under Rule 403 is far from a license for free-wheeling exclusion; it carefully delineates a balancing test that must be applied before evidence can be excluded. In any event, it is important to distinguish between the discretion granted in Rule 403 and the standard of relevance that governs the decision under Rule 401; in one case the Rule gives a greater leeway to exclude evidence, while in the other the judge is given greater freedom to admit evidence.
>
> If one defines "discretion" as a relative immunity from appellate review, then it is correct to say that the trial judge will continue to have discretion in ruling on relevance under Rule 401.

22 C. Wright and K. Graham, *Federal Practice and Procedure* § 5166, 74-75 (1978).

According to Wright and Graham, under Rule 401 the trial judge's authority to exclude evidence is substantially diminished. *Id.* However, this conclusion does not impact the standard of appellate review; it merely becomes part of the analysis of whether the trial judge abused his or her discretion. *Id.* This is confirmed by the language contained in § 5166 of the 2005 supplement to *Wright and Graham*:

> Increasingly federal courts have begun to say that virtually all evidence rulings will only be reviewed under an abuse of discretion standard.
>
> Since evidence whose relevance is debatable is, by definition, evidence of questionable probative worth, the exclusion of such evidence on grounds of relevance will seldom be reversible error.

22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5166, 21 (Supp. 2005).

Both federal and other state court cases hold the appropriate standard of appellate review for trial court decisions under Rule 401 is abuse of discretion. *See e.g. United States v. Abel*, 469 U.S. 45, 54, 83 L. Ed. 2d 450, 459 (1984); *United States v. Masat*, 948 F.2d 923, 933 (5th Cir. 1991); *United States v. Harris*, 542 F.2d 1283, 1317 (7th Cir. 1976); *United States v. Williams* 545 F.2d 47, 50 (8th Cir. 1976); *Juniper v. Commonwealth*, 626 S.E.2d 383, 415 (Va. 2006); *State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997); *People v. Sanders*, 905 P.2d 420, 465 (Cal. 1995); *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993); *State v. Fedorowicz*, 52 P.3d 1194, 1203 (Utah 2002); *Agan v. State*, 417 S.E.2d 156, 160 (Ga. Ct. App. 1992). Similarly, the standard of our appellate review of a trial court's determination to admit evidence under Rule 403 is abuse of discretion. *State v. Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986); *State v. Summers*, 177 N.C. App. 691, 697, 629 S.E.2d 902, 907 (2006).

The standard of appellate review for Rule 401 enunciated in *Wallace* is "great deference," which is stated to fall short of "abuse of discretion," but apparently is not *de novo* review either. North Carolina does not need a different standard of appellate review for decisions under Rule 401 and Rule 403 of our Rules of Evidence. Under Rule 401, the trial court must determine whether the evidence makes the existence of any fact more or less probable. N.C. Gen. Stat. § 8C-1, Rule 401 (2006). Under Rule 403, the trial court must determine whether the probative value of evidence is substantially outweighed by several countervailing factors. N.C. Gen. Stat. § 8C-1, Rule 403 (2006). Both require the trial court to perform a balancing test to determine whether the evidence should be admitted or excluded. This is inherently a discretionary act. Thus, the correct standard of appellate review of these decisions should be abuse of discretion.

I acknowledge that this Court is bound by the holding in *Wallace* and its progeny. *In the matter of Appeal from Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). However, I hope our Supreme Court will address this issue, in this or a future case, so that the standard of appellate review for Rule 401 rulings can be corrected. In addition, the Supreme Court should address this issue in order to remedy a split of authority at this Court. On the one hand there is *Wallace* and its progeny that carry forward the "great deference" standard of appellate review. On the other, there is the case of *Dep't of Transp. v. Elm Land Co.*, which articulated the standard of appellate review as follows: "This Court must determine whether the trial

**CALHOUN v. WHA MED. CLINIC, PLLC**

[178 N.C. App. 585 (2006)]

court abused its discretion in determining whether the proffered evidence was relevant to the issues being tried." 163 N.C. App. at 267, 593 S.E.2d at 138.