IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-330

Filed 15 January 2025

Scotland County, No. 20 CRS 052396

STATE OF NORTH CAROLINA

v.

JIMMY DAVENPORT

Appeal by Defendant from Judgment entered 14 November 2023 by Judge Taylor Browne in Scotland County Superior Court. Heard in the Court of Appeals 24 September 2024.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Marissa K. Jensen, for the State.*

*Marilyn G. Ozer for Defendant-Appellant.*

HAMPSON, Judge.

## **Factual and Procedural Background**

Jimmy Davenport (Defendant) appeals from a Judgment entered upon a jury verdict finding him guilty of First-Degree Murder. The Record before us, including evidence presented at trial, tends to reflect the following:

On 10 December 2020, the victim in this case, Defendant's brother Frankie Tyrone Davenport, was at a gathering with his daughter—Shonquila Wall—as well as Defendant and Amber Bullard. That evening, Wall, Defendant, Frankie

Davenport, and Bullard left the gathering together in Wall's car, and Wall dropped Defendant off on the way back to her house. Wall, Frankie Davenport, and Bullard all returned to Wall's house on Lee's Mill Road in Scotland County, North Carolina. Akeem Breese, who was Wall's boyfriend, and her niece, Gloria Malloy, were also present at Wall's house. Defendant arrived later, knocked on the door, and told Wall he wanted Bullard to come outside. Wall left the entry area and observed Defendant and Frankie Davenport having a "back-and-forth exchange" and Defendant pacing on the porch through the front door window. Bullard, Frankie Davenport, Breese, and Wall were in the living room when they heard the sound of glass shattering from the middle of the front port. According to Wall, all of them got up and ran because they saw a gun coming through the window. Wall testified that Defendant was holding the gun when it came through the window. Wall stated that she believed she heard three gunshots. Wall also testified she heard Frankie Davenport say, "You done f'ed up now. You shot me." Wall then called 911, and she testified that she believed Breese also called 911.

Emergency Call Center records presented at trial showed a 911 call came in from Wall's address on 10 December 2020. Deputy David Blackmon with the Scotland County Sheriff's Office responded. When Deputy Blackmon arrived at the scene, Breese answered the door and reported that someone had been shot and was lying on the living room floor. Deputy Blackmon observed Frankie Davenport lying on the ground with a large pool of blood around his head.

At trial, Wall testified she had communicated with Defendant only through Facebook Messenger because Defendant did not have a phone with service. She stated she believed Frankie Davenport also communicated with Defendant exclusively through Facebook Messenger. Further, Wall stated Frankie Davenport had told her Defendant was threatening him.

During its case in chief, the State sought to introduce as evidence photographs of Defendant's Facebook messages to Frankie Davenport. Deputy Shawn Gagnon with the Scotland County Sheriff's Office testified that a cell phone was collected from the crime scene. Later, he retrieved the phone from the evidence vault, opened the Facebook Messenger application, accessed the message thread with "Jimmy Davenport", and took photographs of the messages. Deputy Gagnon identified State's Exhibit 37 as a photo of a cellphone placed on top of an evidence bag showing the case number corresponding to the underlying matter here and Frankie Davenport's name. Counsel for the State then began to question Deputy Gagnon about State's Exhibit 38—the same cellphone opened to a Facebook message from "Jimmy D."—when counsel for Defendant objected. The trial court then excused the jury.

Counsel for Defendant argued the State had not laid a proper foundation to show where the messages shown in the photographs came from. Counsel for Defendant asserted: "The State's evidence has been that [Defendant] did not have a cell phone. And now the State is purporting to put into evidence what they are saying, I believe, is [sic] text messages from [Defendant] when their own evidence has been

that he didn't have a cell phone." The State responded that the content it sought to introduce were Facebook messages from Defendant, Wall had identified the cellphone as belonging to Frankie Davenport, and Deputy Gagnon testified to the chain of custody and process of retrieving the messages in question. Further, Wall testified that Defendant communicated through Facebook Messenger. The trial court sustained the objection but allowed the State to conduct a voir dire for the exhibits.

During the voir dire, Deputy Gagnon read the contents of the messages in the exhibits at issue and identified how incoming and outgoing messages were color coded. Deputy Gagnon testified again that he had unlocked the phone shown in State's Exhibit 37, went into the Facebook Messenger application, and clicked on the name "Jimmy Davenport". Following the questioning of Deputy Gagnon, the State argued

> for authentication purposes that the content and context of – that are contained within the messages would also aid in the sense of establishing authenticity of the sender. And I'd argue to you that it would be the – I'd argue it's admissible and that any question would go to weight for the jury to determine whether or not they believe, in fact, it's – it would be Mr. Davenport, Jimmy Davenport, the defendant in this case, sending the message.

The trial court found that the State had, through voir dire, properly authenticated the messages, reversed its previous ruling, and overruled defense counsel's objection.

Additionally, during its case in chief, the State called Samantha Dutch, the Director of the Scotland County Emergency Communications Center. Dutch testified that when the Center receives a 911 call, each call is "documented in what is called a

CAD system, which is basically our database system for keeping track of notes and all other information for responders and the calls themselves." During the State's direct examination, Dutch identified a State evidentiary exhibit as a CAD report from the date of the incident—10 December 2020. Defendant objected to the admission of the CAD report, and the trial court heard arguments about the admissibility of the report outside of the presence of the jury.

During the voir dire that followed, the State clarified precisely what it sought to introduce: "The State would not be introducing the audio call because it's [sic] been purged from the system. It would just be the CAD report showing that a call was made and which may be used, I guess, later for other purposes[.]" Further, the State limited its exhibit to one page, which contained only the report of the call's occurrence:

> [State's Counsel]: And specifically, this one is a single page, I think. And can you determine whether or not there are any notes or any other comments that would be inputted by other individuals on that?
>
> [Dutch]: Yes.
>
> [State's Counsel]: Okay. And are there any other notes or any other comments?
>
> [Dutch]: Not on this page.
>
> [State's Counsel]: Okay. But there would be a separate page?
>
> [Dutch]: That's correct.
>
> [State's Counsel]: Okay. And is that — how are you able to determine that?

> [Dutch]: The bottom of this printout shows that this is page 1 of
> 2. And also being familiar with the printouts, they always show
> a comment section that is not here.

Counsel for Defendant objected on the basis that the CAD report was not relevant. The trial court overruled the objection and explained its reasoning: "Well, according to Rule 401, if it has any tendency. I believe the report states that a phone call was made around the relevant time. It's a 9-1-1 phone call. I suppose it does have some tendency to make the existence of a fact in consequence more probable than not." Upon resuming the direct examination of Dutch, she testified after the CAD report was admitted, consistent with the trial court's ruling and the limitations of the exhibit the State had expressed, that the CAD report reflected a call came in to the Emergency Call Center on 10 December 2020 at 3:43 a.m.

Later, the State questioned Deputy David Blackmon about his response to the incident. Deputy Blackmon testified he stayed at the crime scene after officers secured the perimeter. The State then asked: "Did you ever respond to any calls during that time?" Deputy Blackmon began to respond, "A few hours later, we had a call in reference to–". At that point, counsel for Defendant interjected to object. The trial court sustained the objection and conducted another voir dire outside of the presence of the jury. During that voir dire, Deputy Blackmon spoke to the contents of the 911 call. Based on questioning from both parties, the trial court observed the testimony was "getting farther and farther removed," and stated: "Let me just put it on the record that the Court will sustain defense counsel's objection based on Rule

401 and 402 to the extent that the testimony is relevant. The Court finds that the danger of unfair prejudice to the defendant substantially outweighs any probative value of the proffered evidence." The trial court expressly distinguished between the CAD report, which showed only that a call had been made, and the content of the call as reported by Deputy Blackmon: "I believe [Deputy Blackmon] confirmed that another phone call came in and that he had to leave. I think that's . . . any objection to that is overruled. But to the contents of the phone call stating that his life is in danger by the defendant or the perpetrator or the suspect of the first shooting, that's sustained. . . . Contents of the conversation are off limits." When the jury returned, Deputy Blackmon testified:

> [State's Counsel]: And I think we were at the portion – I had asked did you receive any other calls for service?
>
> [Deputy Blackmon]: I did, yes.
>
> [State's Counsel]: Okay. And at that point, did you leave the location where you were?
>
> [Deputy Blackmon]: Yes.

On 14 November 2023, the jury returned a verdict finding Defendant guilty of First-Degree Murder. The trial court sentenced Defendant to life imprisonment without parole. Defendant orally gave Notice of Appeal on 14 November 2023.

## Issues

The issues on appeal are whether the trial court erred by admitting: (I) photographs of Facebook messages purportedly sent by Defendant; and (II) a CAD

report of a 911 call.

## Analysis

I.    Facebook Messages

"We review *de novo* rulings on authentication issues under Rule of Evidence 901." *State v. Jones*, 288 N.C. App. 175, 187, 884 S.E.2d 782, 793 (2023) (citing *State v. Crawley*, 217 N.C. App. 509, 515-16, 719 S.E.2d 632, 637 (2011)). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Hicks*, 243 N.C. App. 628, 639, 777 S.E.2d 341, 348 (2015) (quoting *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008)).

Rule 901 of our Rules of Evidence provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901(a) (2023). "Pursuant to Rule 901 of the North Carolina Rules of Evidence, every writing sought to be admitted must first be properly authenticated." *State v. Clemons*, 274 N.C. App. 401, 414, 852 S.E.2d 671, 679 (2020) (quoting *State v. Allen*, 258 N.C. App. 285, 288, 812 S.E.2d 192, 195 (2018)). One way our Rules of Evidence provide a writing or other piece of evidence may be authenticated is by "Distinctive Characteristics and the Like–Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." N.C. Gen. Stat. § 8C-1, Rule 901(b)(4) (2023).

Further, our Courts have acknowledged "the authorship and genuineness of letters, typewritten or other, may be proved by circumstantial evidence[.]" *State v. Davis*, 203 N.C. 13, 28, 164 S.E. 737, 745 (citation omitted), *cert. denied*, 287 U.S. 649, 53 S. Ct. 95, 77 L. Ed. 561 (1932). Additionally, "[i]t [is] not error for the trial court to admit the [evidence] if it could reasonably determine that there was sufficient evidence to support a finding that 'the matter in question is what its proponent claims.'" *State v. Wiggins*, 334 N.C. 18, 34, 431 S.E.2d 755, 764 (1993) (quoting N.C. Gen. Stat. § 8C-1, Rule 901(a)). "Importantly, the burden to authenticate under Rule 901 is not high—only a prima facie showing is required[.]" *State v. Ford*, 245 N.C. App. 510, 519, 782 S.E.2d 98, 105 (2016) (quoting *U.S. v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014) (citation and quotation marks omitted)).

This Court has concluded a trial court did not err in admitting two screenshots of a defendant's social media webpage where the account at issue was attached to a screenname that reflected the defendant's nickname and the account displayed pictures of the defendant. *Ford*, 245 N.C. App. at 521, 782 S.E.2d at 106. In *Ford*, the defendant appealed from a conviction for involuntary manslaughter where his dog attacked the victim. *Id.* at 514-15, 782 S.E.2d at 102. There, a detective testified he found photographs of the defendant and the dog in question on a MySpace page accompanying the defendant's nickname. *Id.* at 513, 782 S.E.2d at 101. The Court concluded, "[w]hile tracking the webpage directly to defendant through an appropriate electronic footprint or link would provide some technological evidence,

such evidence is not required in a case such as this, where strong circumstantial evidence exists that this webpage and its unique contents belong to defendant." *Id.* at 521, 782 S.E.2d at 106. That "strong circumstantial evidence" included photographs of the defendant, corroboration that the username was defendant's nickname, and a video with a song where the detective identified the voice in the song as the defendant's. *Id.*

In *State v. Clemons*, this Court considered whether Facebook comments posted from the victim's daughter's Facebook account were properly authenticated as belonging to the defendant. 274 N.C. App. at 415, 852 S.E.2d at 680. There, the Court concluded "the distinctive characteristics of the post in conjunction with the circumstances are sufficient to conclude [d]efendant wrote the comments." *Id.* The Court pointed to circumstantial evidence showing the defendant had access to the Facebook account, the comments began "a week or two" after the defendant was released from prison, the close relationship between the defendant and the victim's daughter, and the posts themselves which the victim testified were unlike her daughter. *Id.*

Here, two witnesses—Shonquila Wall and Deputy Gagnon—provided pertinent testimony. Wall identified the victim's cellphone in photographs during her testimony. Further, she testified she communicated with Defendant "[o]nly through Facebook [M]essenger" because he did not have a working phone. Wall further stated she knew the victim had communicated with Defendant, likewise only through

Facebook Messenger because Defendant did not have a working phone. This is consistent with the type of circumstantial evidence this Court concluded was sufficient to authenticate the Facebook messages in *Clemons*. In a similar vein, while in *Clemons* the Court looked at the Facebook comments as a clear deviation from the victim's daughter's typical behavior—and thus supporting the inference that someone else wrote the comments—here, Wall's testimony was that the use of Facebook Messenger was consistent with Defendant's behavior.

Additionally, during voir dire Deputy Gagnon testified to how he retrieved the messages from the phone, which Wall had identified at the scene as belonging to Frankie Davenport. This is consistent with *Ford* in which the detective testified to how he discovered the MySpace page at issue. Further, Deputy Gagnon also read the content of the messages, which contained references and information corroborating their authenticity. In one exchange, the message from "Jimmy D." read, "I hope you enjoy your day with Jayden 'cause it just may [be] your last one with him." This is consistent with Wall's earlier testimony that Frankie Davenport's son's name was Jayden and that Davenport was spending time with Jayden around the time of the incident. Another message read: "I'll see you tomorrow at dialysis, big bro." The State established at trial that Defendant and Frankie Davenport were brothers and Frankie Davenport was Defendant's older brother, supporting the inference Defendant had sent the message because he referred to Davenport as "big bro."

These references to the nature of the sender's relationship to Frankie

Davenport, as well as to the sender's knowledge about details of Frankie Davenport's personal life, are sufficient "distinctive characteristics" to authenticate the messages. *See* N.C. Gen. Stat. § 8C-901(b)(4) (2023). Therefore, the messages were properly authenticated. Thus, the trial court did not err in admitting photos of the Facebook messages.

II.      CAD Report of 911 Call

Defendant contends the CAD report of a 911 call was erroneously admitted into evidence where the trial court subsequently held the content of that call was inadmissible. Specifically, Defendant argues the trial court's decisions to admit the CAD report showing a 911 call had been received approximately two hours after the incident and to exclude the content of the call were inconsistent. We disagree.

Under our Rules of Evidence, "[a]ll relevant evidence is admissible," unless otherwise provided. N.C. Gen. Stat. § 8C-1, Rule 402 (2023). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2023). "Although the trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal." *State v. Allen*, 265 N.C. App. 480, 489, 828 S.E.2d 562, 570 (citation omitted), *appeal dismissed, disc. rev. denied*, 373 N.C. 175, 833 S.E.2d 806 (2019). "Although relevant, evidence may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice[.]" N.C. Gen. Stat. § 8C-1, Rule 403 (2023).

Here, the trial court admitted the CAD report over Defendant's objection that it was not relevant. We note at the outset that our Supreme Court has described this relevancy threshold as "relatively lax." *State v. McElrath*, 322 N.C. 1, 13, 366 S.E.2d 442, 449 (1988). "Moreover, '[i]n order to be relevant, evidence need not bear directly on the question in issue if it is helpful to understand the *conduct of the parties*, their motives, or if it reasonably allows the jury to draw an inference as to a disputed fact.' " *State v. Norris*, 287 N.C. App. 302, 314, 882 S.E.2d 608, 617 (2022) (emphasis added) (quoting *State v. Miller*, 197 N.C. App. 78, 86, 676 S.E.2d 546, 551, *disc. rev. denied*, 363 N.C. 586, 683 S.E.2d 216 (2009)). First, the CAD report had a tendency to make the fact that an incident occurred in the early morning of 10 December 2020 more likely because the report showed a 911 call had been made at 3:43 a.m. Second, as the trial court articulated, the CAD report was relevant to explain why Detective Blackmon left his location. This is consistent with prior cases in which our Courts have upheld the admission of evidence to show its effect on a person involved. *See State v. McCutcheon*, 281 N.C. App. 149, 153, 867 S.E.2d 572, 577 (2021) ("Evidence 'offered to explain the conduct of a witness [is] relevant and admissible[.]' " (quoting *State v. Roper*, 328 N.C. 337, 356, 402 S.E.2d 600, 611 (1991))); *State v. Potter*, 295 N.C. 126, 132, 244 S.E.2d 397, 401-02 (1978) (witness' testimony regarding a threat to her husband admissible to explain her subsequent conduct in calling the police);

*State v. Dial*, 122 N.C. App. 298, 311, 470 S.E.2d 84, 92 (1996) (witness' testimony regarding threatening statements by defendant about victim relevant and admissible to explain subsequent conduct in calling crime tip line).

Defendant points to the trial court's decision to exclude the content of the call as support for his argument the CAD report should have been excluded. The actual content of the call, however, is a separate evidentiary matter which the trial court, in its discretion, determined—even if relevant—was substantially more prejudicial than probative under Rule 403. *See State v. Grant*, 178 N.C. App. 565, 573-74, 632 S.E.2d 258, 265 (2006) ("A trial court has discretion whether or not to exclude evidence under Rule 403, and a trial court's determination will only be disturbed upon a showing of an abuse of discretion." (citing *State v. Campbell*, 359 N.C. 644, 674, 617 S.E.2d 1, 20 (2005), *cert. denied*, *Campbell v. North Carolina*, 547 U.S. 1073, 126 S. Ct. 1773, 164 L. Ed. 2d 523 (2006))). Indeed, these rulings are consistent and show an effort by the trial court to provide jurors with explanatory information as to why Detective Blackmon left Wall's house, while protecting Defendant from undue prejudice as the jury was prevented from hearing statements which might have resulted in unfair prejudice against him.

Thus, the trial court properly determined the CAD report was relevant. Therefore, the trial court did not err in admitting it into evidence. Consequently, there was no error in Defendant's trial and the trial court properly entered judgment on the jury verdict.

## <u>Conclusion</u>

Accordingly, for the foregoing reasons, we conclude there was no error in Defendant's trial and affirm the Judgment.


NO ERROR.

Judges STROUD and ZACHARY concur.