IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-746

No. COA21-670

Filed 15 November 2022

Pasquotank County, No. 18 CRS 050635

STATE OF NORTH CAROLINA

v.

RAYMOND WOODLEY

Appeal by defendant from judgment entered 15 January 2021 by Judge Jeffery B. Foster in Pasquotank County Superior Court. Heard in the Court of Appeals 21 September 2022.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Robert C. Montgomery, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Daniel Shatz, for defendant-appellant.*

TYSON, Judge.

Raymond Woodley ("Defendant") appeals from judgment entered after a jury's unanimous verdict convicted him of first-degree murder. We find no error.

## I. Background

Trevon Blount, a nineteen-year-old black male, and his friend, Trevor Debowski, left a party at a friend's house around 9:30 p.m. on 3 May 2018. The pair walked onto Holly Street in Elizabeth City. The men approached a crowd of people on the street. Defendant, also a nineteen-year-old black male, was present in the

crowd on the street, and began "fussing and arguing" with Blount. Defendant pulled a gun from the waistband of his pants and began shooting at Blount as he ran down the street.

¶ 3        An autopsy of Blount's body revealed he had suffered nine .40 caliber gunshot wounds, including three in his back, one in the back of his left shoulder, and one to his head. Two of the shots to Blount's back caused damage to the lungs, heart, and liver, and were fatal. Blount's body also displayed lacerations on his head and upper extremities.

¶ 4        Charlie Unangst, who lived nearby, heard the commotion, witnessed the shooting, and called 911 to report the shooting. Unangst reported the shooter was a black male and wearing a Nike jacket.

¶ 5        Miranda Darlene Lane was sitting inside a car on Holly Street with Keion Burnham and Angelina Silver smoking marijuana. Lane also observed the shooting and reported seeing Blount and the shooter running past her car, Blount falling down, and the shooter continuing to shoot. When the police interviewed Lane, she identified Defendant as a black male with braided hair and the shooter with eighty to ninety percent certainty in a photographic lineup.

¶ 6        Burnham also observed the shooting. He clearly saw the shooter's silver and black handgun, got a good look at the shooter's face, and had "no doubt" it was Defendant. Silver was seated in the backseat and did not see the shooter's face, but

testified she recognized Defendant as the shooter, based upon the appearance of his hair.

¶ 7        Police arrived at the scene of the shooting shortly before 9:30 p.m. and observed people running from the area where Blount's body lay. Police found no weapon at the scene but found and collected six Smith and Wesson .40 caliber shell casings. A K9 unit tracked a scent approximately three quarters of a mile to the back door of a residence where Jamariaron Taylor lived.

¶ 8        Defendant's cousin, Rashawn Cole, informed Police he was present with Defendant on the night of the shooting. Cole described the shooting and how he and Defendant ran to Taylor's house after the shooting. While Cole and Defendant were incarcerated, Defendant later threatened to "beat up" Cole because he had spoken to law enforcement.

¶ 9        Police later learned Kimberly Ashley, Defendant's sister, had contacted Britney Spence, Blount's sister, via Facebook Messenger almost eight months prior to the murder. In the Facebook message, Ashley asserted Blount had taken money from Defendant and had not provided him with a gun as was promised. Spence told Blount about the message, but he denied any involvement. Defendant's sister, Ashley, had acquired a Smith and Wesson .40 caliber handgun prior to the murder.

¶ 10       While incarcerated and awaiting trial, Defendant described Blount's murder to his cellmate. Defendant said he went looking for Blount over "disrespect" with

about a dozen friends, found and argued with him, became frustrated, and began shooting. After emptying the "clip" in his weapon, Defendant caught up to Blount attempting to escape, kicked his legs out from under him, and beat and kicked Blount until Defendant was certain Blount was dead. Blount's body displayed lacerations on his head and upper extremities, in addition to the gunshot wounds, consistent with Defendant's post-shooting actions. Defendant went to Taylor's house, where he wrapped the gun in his windbreaker until he could retrieve it, and take it to Virginia. Defendant was indicted by the grand jury for first-degree murder.

¶ 11 The jury unanimously found Defendant guilty of first-degree murder and he was sentenced to life in prison without parole. Defendant appeals.

## II. Jurisdiction

¶ 12 At trial and in briefing before this Court Defendant conceded the trial court's jurisdiction. However, Defendant's appellate counsel at oral argument asserted: "In preparing for this argument and thinking about it, I'm not sure that this isn't a [subject matter jurisdiction issue.]" The test of subject matter jurisdiction is well settled.

¶ 13 "Subject matter jurisdiction involves the authority of a court to adjudicate the type of controversy presented by the action before it[.]" *State v. Petty*, 212 N.C. App. 368, 371, 711 S.E.2d 509, 512 (2011) (citation omitted). "[A] trial court must have subject matter jurisdiction over a case in order to act in that case[,] and [ ] a court's

lack of subject matter jurisdiction is not waivable and can be raised at any time" including for the first time on appeal. *Id.* (internal quotation marks and citations omitted). "The State bears the burden in criminal matters of demonstrating beyond a reasonable doubt that a trial court has subject matter jurisdiction." *State v. Williams*, 230 N.C. App. 590, 595, 754 S.E.2d 826, 829 (2013) (citation omitted).

¶ 14　　　　　Subject matter jurisdiction "is conferred upon the courts by either the North Carolina Constitution or by statute." *Petty*, 212 N.C. App at 371, 711 S.E.2d at 512 (citation omitted). Article IV, section 1 of the North Carolina Constitution vests the judicial power of the State in a General Court of Justice. N.C. Const. art IV, § 1. The General Court of Justice consists "of an Appellate Division, a Superior Court Division, and a District Court Division." N.C. Const. art IV, § 2.

## A. Article IV, § 12 of the North Carolina Constitution

¶ 15　　　　　Pursuant to Article IV, section 12 of the North Carolina Constitution, "the Superior Court shall have original general jurisdiction throughout the State." N.C. Const. art IV, § 12; *see* N.C. Gen. Stat. § 7A-271 (2021) ("The superior court has exclusive, original jurisdiction over all criminal actions not assigned to the district court division[.]").

¶ 16　　　　　Our General Statutes provide:

> Authority of Chief Justice. — When the Chief Justice of the North Carolina Supreme Court determines and declares that catastrophic conditions exist or have existed in one or

more counties of the State, the Chief Justice may by order entered pursuant to this subsection:

(1) Extend, to a date certain no fewer than 10 days after the effective date of the order, the time or period of limitation within which pleadings, motions, notices, and other documents and papers may be timely filed and other acts may be timely done in civil actions, criminal actions, estates, and special proceedings in each county named in the order. The Chief Justice may enter an order under this subsection during the catastrophic conditions or at any time after such conditions have ceased to exist. The order shall be in writing and shall become effective for each affected county upon the date set forth in the order, and if no date is set forth in the order, then upon the date the order is signed by the Chief Justice.

(2) Issue any emergency directives that, notwithstanding any other provision of law, are necessary *to ensure the continuing operation of essential trial or appellate court functions, including the designation or assignment of judicial officials who may be authorized to act in the general or specific matters stated in the emergency order,* and the designation of the county or counties and specific locations within the State where such matters may be heard, conducted, or otherwise transacted. The Chief Justice may enter such emergency orders under this subsection in response to existing or impending catastrophic conditions or their consequences. An emergency order under this subsection shall expire the sooner of the date stated in the order, or 30 days from issuance of the order, but the order may be extended in whole or in part by the Chief Justice for additional 30-day periods if the Chief Justice determines that the directives remain necessary.

N.C. Gen. Stat. § 7A-39 (b) (2021) (emphasis supplied).

¶ 17    Pursuant to N.C. Gen. Stat. § 7A-39(b)(2) then Chief Justice Cheri Beasley on

14 December 2020 reinstated Emergency Directive 1 and modified and reinstated Emergency Directive 10. *See* Order of the Chief Justice of North Carolina, (14 Dec. 2020), https://www.nccourts.gov/assets/news-uploads/14%20December%202020%20-%207A39%28b%29%282%29%20Order%20Extending%20Emergency%20Directives%201-5%2C%208-15%2C%2018%2C%2020 22%20%28Final%29.pdf?fwcb9Jh3QU_twAJOVr6Vpa0PuktaRX2c=#:~:text=Emerg ency%20Directive%201,All%20superior%20court&text=the%20senior%20resident% 20superior%20court,and%20safety%20of%20all%20participants.

¶ 18     Emergency Directive 1 provides:

> All superior court and district court proceedings, including proceedings before the clerks of superior court, must be scheduled or rescheduled for a date no sooner than 14 January 2021, unless:
>     a. the proceeding will be conducted remotely;
>     b. the proceeding is necessary to preserve the right to due process of law (e.g., a first appearance or bond hearing, the appointment of counsel for an indigent defendant, a probation hearing, a probable cause hearing, etc.);
>     c. the proceeding is for the purpose of obtaining emergency relief (e.g., a domestic violence protection order, temporary restraining order, juvenile custody order, judicial consent to juvenile medical treatment order, civil commitment order, etc.); or
>     d. *the senior resident superior court judge*, chief business court judge, or chief district court judge *determines that the proceeding can be conducted under conditions that protect the health and safety of all participants.*
>
> The examples provided above are not exhaustive.

*Id.* (emphasis supplied).

Emergency Directive 10 provides: "No jury trials shall be conducted in the superior or district court of any county for the next thirty (30) days, unless a jury has already been empaneled." *Id.*

## B. Specific Commission

On 1 January 2021, Senior Associate Justice Paul M. Newby took his oath as Chief Justice of North Carolina. Under the authority of the Chief Justice and order, the Administrative Office of the Courts ("AOC") issued a commission on 5 January 2021, to a superior court judge to preside over a Regular Session of Superior Court in Pasquotank County, Schedule B, for the trial of Criminal and Civil cases calendared to begin 11 January 2021. *See Hinkle v. Hartsell*, 131 N.C. App. 833, 836, 509 S.E.2d 455, 457 (1998) ("[J]udicial notice is appropriate to determine the existence and jurisdiction of the various courts of the State; their terms or sessions, and judges; the counties comprising the various judicial districts; and, any earlier proceedings in the court involving the same case." (citing 1 Kenneth S. Broun, *Brandis & Broun on North Carolina Evidence* § 26, at 102 (5th ed. 1998)).

On 11 January 2021, Chief Justice Newby issued a letter to Judicial Branch Stakeholders where a draft of an order of the Chief Justice of the Supreme Court of North Carolina to be issued on 13 January 2021 and become effective on 14 January

2021, including the expiration of the 14 December 2020 Emergency Directives, wherein Emergency Directives 1 and 10 were ordered to expire.

¶ 22        Emergency Directive 10 did not divest the superior court of either its Constitutional or Statutory jurisdiction. The superior court session was presided over by a superior court judge, who was lawfully commissioned under the authority of the Chief Justice for the superior court civil or criminal sessions beginning on 11 January 2021, which included this case by counsel's prior agreement and consent. Jury Selection began on 12 January 2021 and the jury was empaneled the following day on 13 January 2021. This panel need not examine the validity of orders issued beyond the term of the Chief Justice. The 5 January 2021 AOC commission for this session and the 13 January 2021 order from Chief Justice Newby effectively repudiated and superseded the 14 December 2020 order. Defendant's challenge to the trial court's subject matter jurisdiction is without merit and overruled.

¶ 23        Appellate jurisdiction lies in this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(1) (2021).

## III.    Issues

¶ 24        Defendant argues the trial court erred by: (1) denying his motion to continue; (2) improperly excluding his father from the courtroom; (3) varying from the statutory jury selection procedure; and, (4) admitting inadmissible evidence.

## IV.    Defendant's Motion to Continue

## A. Standard of Review

A motion to continue generally rests within the trial court's discretion and is reviewable on appeal only for an abuse of discretion. *State v. Thomas*, 294 N.C. 105, 111, 240 S.E.2d 426, 431 (1978) (citations omitted). When the motion to continue is based upon a constitutional right, "the question presented is one of law and not of discretion, and the order of the court below is reviewable" on appeal. *State v. Harris*, 290 N.C. 681, 686, 228 S.E.2d 437, 440 (1976) (citations omitted).

## B. COVID-19

In arguing her motion to continue, Defendant's trial counsel asserted in the wake of the COVID-19 pandemic she did not feel it was the "correct time" to proceed to trial. She argued purported concerns for her own health would deprive Defendant of effective assistance of counsel, and she would have to put herself at risk by being in court and by going to visit the jail each evening to discuss the trial progress with Defendant. During the hearing on the motion to continue, the following colloquy occurred between Defendant's counsel and the trial court:

> DEFENDANT'S COUNSEL: And so, again, as I stated earlier, when I agreed the last time to get the case tried, I had no idea the numbers were going to go up. I don't have any control over that. And yes, I have grave concerns and I do not believe that I can be effective for [Defendant]. I have explained that to [Defendant]. I have explained that, you know, my mind is all over the place as it relates [to COVID-19].
>
> THE COURT: You mentioned that a couple of times. Is it

your position to the Court that you are emotionally and mentally unable to proceed as counsel for this defendant?

DEFENDANT'S COUNSEL: At this point, yes.

THE COURT: Okay. And so you are calling into question your own competency to represent him?

DEFENDANT'S COUNSEL: Yes, sir.

¶ 27 Following a recess, the trial court further inquired into Defendant's counsel's preparation for trial and basis for apprehension:

THE COURT: [Defendant's counsel], I've got a couple of follow-up things I need to address with you before I rule. Number one, notwithstanding the COVID issue that you have raised, are you otherwise prepared to go forward with this case?

DEFENDANT'S COUNSEL: Can you clarify the question?

THE COURT: Yes. Are you legally ready, done your preparation, and are you ready to present your case and defend your client based on the work that needed to be done?

DEFENDANT'S COUNSEL: Based on the work that needs to be done, yes.

THE COURT: So you are prepared to go forward from a work standpoint?

DEFENDANT'S COUNSEL: As far as all of the evidence in the case?

THE COURT: Absent COVID, you would be fine to go ahead and try this case?

DEFENDANT'S COUNSEL: I'm just trying to figure out how to clearly answer that question.

THE COURT: Yes or no.

DEFENDANT'S COUNSEL: I think my concerns with COVID, absent that, yes.

THE COURT: So the only reason for your motion to continue here is COVID and not any lack of preparation on your part that would prejudice or bias your client?

DEFENDANT'S COUNSEL: As it relates to preparation to advise my client, no. As it relates to my concerns with COVID and - -

THE COURT: Notwithstanding your concerns about COVID, we're not talking about COVID now. Let's assume COVID is not in the picture and we're all here without masks on, you would be ready to go forward with the defense of your client?

DEFENDANT'S COUNSEL: Yes.

¶ 28     Defendant's counsel initially expressed potential concerns about her health and about her ability to represent Defendant in a courtroom, specifically communicating without a mask to the jury and having to remain seated six feet apart from Defendant at the counsel table. She argued Defendant may be prejudiced, if the jury observed her sitting so far away from him at the table.

¶ 29     Defendant's trial counsel further argued she was worried about staying with her mother, who is a nurse. The trial court informed Defendant's counsel the State could authorize funds for her to stay in a hotel instead of staying with her mother. Defendant's counsel stated she was legally prepared to try the case. Defendant's counsel had earlier picked and agreed to the calendared date to try the case when

jury trials resumed after the COVID-19 pandemic.

¶ 30 In arguing her motion to further continue, the calendared date of trial Defendant's counsel only stated she was concerned about the COVID-19 pandemic and its effects on her being in court. Criminal defendants are constitutionally guaranteed "a fair trial and a competent attorney." *Engle v. Isaac,* 456 U.S. 107, 134, 71 L.Ed.2d 783, 804 (1982). "To establish a constitutional violation, a defendant must show that he did not have ample time to confer with counsel and to investigate, prepare and present his defense." *State v. Tunstall*, 334 N.C. 320, 329, 432 S.E.2d 331, 337 (1993) (citation omitted).

¶ 31 In order to show ineffective assistance of counsel, a defendant must satisfy the two-prong test announced by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L.Ed.2d 674, 693 (1984). This test for ineffective assistance of counsel has also been explicitly adopted by the Supreme Court of North Carolina for state constitutional purposes. *State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). Pursuant to *Strickland*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it

cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687, 80 L.Ed.2d at 693; *accord Braswell*, 312 N.C. at 561-62, 324 S.E.2d at 248.

Defendant has failed to show he suffered prejudice or the trial court abused its discretion by denying Defendant's motion to continue. As Defendant's counsel stated, she was legally prepared to try the case, but was solely worried about potential COVID-19 risks. Defendant's appellate counsel points to several instances where he asserts Defendant's trial counsel's personal interest in avoiding COVID-19 purportedly caused her to perform deficiently but makes no showing of any deficient representation throughout trial. Defendant did not and cannot meet either prong of *Strickland*. He cannot show the errors are "so serious as to deprive [him] of a fair trial" nor can or did he show any prejudice. *Id.* Defendant's argument is overruled.

## C. Emergency Directive 2

Defendant further argues the trial court should have granted his motion for a continuance because Defendant's trial counsel should not have been allowed in the courtroom and trial should not have commenced pursuant to Emergency Directive 2. Chief Justice Beasley reinstated Emergency Directive 2 on 14 December 2020. *See* Order of the Chief Justice of North Carolina, (14 Dec. 2020), https://www.nccourts.gov/assets/news-uploads/14%20December%202020%20-

%207A-

39%28b%29%282%29%20Order%20Extending%20Emergency%20Directives%201-

5%2C%208-15%2C%2018%2C%2020-

22%20%28Final%29.pdf?fwcb9Jh3QU_twAJOVr6Vpa0PuktaRX2c=#:~:text=Emerg

ency%20Directive%201,-

All%20superior%20court&text=the%20senior%20resident%20superior%20court,and

%20safety%20of%20all%20participants.

¶ 34      Emergency Directive 2 provides:

> The clerks of superior court shall post a notice at the entrance to every court facility in their county directing that any person *who has likely been exposed* to COVID-19 should not enter the courthouse. *A person who has likely been exposed to COVID-19 and who has business before the courts shall contact the clerk of superior court's office by telephone or other remote means, inform court personnel of the nature of his or her business before the court, and receive further instruction.* For purposes of this order, a person who has *likely been exposed* to COVID-19 is defined as any person who:
>
> > a. is experiencing fever, cough, shortness of breath, or loss of smell and/or taste;
> >
> > b. is under a direction to quarantine, isolate, or self-monitor;
> >
> > c. has been exposed to a person who tested positive for COVID-19 within the last fourteen (14) days;
> >
> > d. has been diagnosed with COVID-19 within the last fourteen (14) days; or

> e. resides with or has been in close contact with any person in the abovementioned categories.

*Id.* (emphasis supplied).

Defendant's counsel's motion to continue filed on the commencement of the 11 January 2021 session asserted no reference to Emergency Directive 2. Defendant's counsel made no prior contact with the clerk of superior court and only asserted her potential COVID-19 exposure and Emergency Directive 2 in open court while arguing her motion.

Defendant's counsel did not invoke any of the protocols established in Directive 2, specifically, "A person who has likely been exposed to COVID-19 and who has business before the courts shall contact the clerk of superior court's office by telephone or other remote means, inform court personnel of the nature of his or her business before the court, and receive further instruction." *Id.*

Defendant's counsel did not contact any official or officer of the court *via* any "remote means" for further instructions, but, only after coming to court and as asserted support in arguing her motion, did she inform the court of this potential issue. Defendant has shown no abuse of discretion or constitutional violation in the trial court's denial of his day of trial motion to continue. Defendant's argument is overruled.

## V.  Courtroom Closure

¶ 38        Defendant asserts his federal and state constitutional rights to a public trial were violated when Defendant's father was excluded from the courtroom during jury selection.

## A. Standard of Review

¶ 39        Defendant failed to object to the exclusion of his father from the courtroom during jury selection. Defendant has failed to preserve this issue for appellate review. "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal." *State v. Lloyd*, 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001) (citation omitted).

## B. Rule 2 of the North Carolina Rules of Appellate Procedure

¶ 40        Defendant seeks for this Court to invoke Rule 2 of the Appellate Rules of Procedure to review the merits of this argument. This Court may suspend the Appellate Rules under Rule 2, in order "[t]o prevent manifest injustice to a party, or to expedite decision in the public interest." N.C. R. App. P. 2.

¶ 41        Our Supreme Court has addressed the appropriateness of discretionarily invoking Rule 2 on many occasions. "Rule 2 relates to the residual power of our appellate courts to consider, *in exceptional circumstances*, significant issues of importance in the public interest or to prevent injustice which appears to manifest to the Court *and only in such instances*." *State v. Hart*, 361 N.C. 309, 315-16, 644 S.E.2d 201, 205 (2007) (citations and quotation marks omitted) (emphasis supplied).

¶ 42        "[T]he exercise of Rule 2 was intended to be limited to occasions in which a fundamental purpose of the appellate rules is at stake, which will necessarily be rare occasions." *Id.* at 316, 644 S.E.2d at 205 (citations and internal quotation marks omitted).

¶ 43        Nothing in the record or in either party's brief demonstrates "exceptional circumstances" sufficient to justify suspending or varying the rules in order to prevent "manifest injustice" to Defendant." *Id.* at 315, 644 S.E.2d at 205. The trial court reported the Defendant's father was not allowed to enter because the courtroom had no occupancy to accommodate him due to the limited occupancy as a result of COVID-19 social distancing protocols with members of the jury pool who had already been brought into the courtroom. In the exercise of our discretionary authority, we decline to invoke Rule 2 to further review this assertion. Defendant's unpreserved argument is dismissed.

## VI.    Jury Selection

¶ 44        Defendant argues the trial court erred by allowing the State to question and pass a panel of fewer than twelve prospective jurors to him. Defendant contends this violated the provisions of N.C. Gen. Stat § 15A-1214 (2021) and entitles him to a new trial.

## A. Standard of Review

¶ 45        "When a trial court acts contrary to a statutory mandate, the defendant's right

to appeal is preserved despite the defendant's failure to object during trial." *State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000) (citation omitted). "In reviewing a trial court's deviation from the statutory procedure for the passing of jurors to the defendant where [the] defendant failed to object to the procedure, we review for plain error. *State v. Gurkin*, 234 N.C. App. 207, 213, 758 S.E.2d 450, 455 (2014).

¶ 46        To show plain error "a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations and internal quotation marks omitted). The plain error rule is to be applied cautiously and only in exceptional cases, and the error will be one so prejudicial and that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]" *Id.* (citations and quotation marks omitted).

## B. Analysis

¶ 47        Our appellate rules provide:

> In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.

N.C. R. App. P. 10(a)(4). Defendant does not argue the passing of fewer than twelve prospective jurors during jury selection amounted to plain error. Defendant has failed to "specifically and distinctly contend [ ] . . . plain error" and is not entitled to plain error review on the issue. *Id.*; *see State v. Goncalves*, __ N.C. App. __, __, __ S.E.2d __, __, 2022-NCCOA-610, ¶ 21 (2022) (unpublished).

¶ 48        Presuming Defendant did not waive appellate review of this issue, he is not entitled to a new trial. The North Carolina jury selection statute provides, *inter alia*:

> **(d)** The prosecutor must conduct his examination of the first 12 jurors seated and make his challenges for cause and exercise his peremptory challenges. If the judge allows a challenge for cause, or if a peremptory challenge is exercised, the clerk must immediately call a replacement into the box. When the prosecutor is satisfied with the 12 in the box, they must then be tendered to the defendant. Until the prosecutor indicates his satisfaction, he may make a challenge for cause or exercise a peremptory challenge to strike any juror, whether an original or replacement juror.
>
> **(e)** Each defendant must then conduct his examination of the jurors tendered him, making his challenges for cause and his peremptory challenges. If a juror is excused, no replacement may be called until all defendants have indicated satisfaction with those remaining, at which time the clerk must call replacements for the jurors excused. The judge in his discretion must determine order of examination among multiple defendants.

N.C. Gen. Stat. § 15A-1214(d), (e) (2021).

¶ 49        In order to comply with COVID-19 guidance on social distancing, the trial court

called five prospective jurors spaced out six feet apart into the jury box. When the State accepted five jurors, the trial court tendered those jurors to Defendant for examination.

¶ 50        Defendant exercised two pre-emptory challenges on two of these five prospective jurors. The trial court called two replacement prospective jurors for the State to question. The State passed these two prospective jurors to Defendant. Defendant challenged one of those prospective jurors. A single replacement was called, whom Defendant questioned and accepted to serve. Once Defendant had accepted five jurors, the trial court called five more prospective jurors socially distanced. When Defendant challenged two of those prospective jurors, the trial court called four new jurors into the box. The State and Defendant questioned and accepted these four jurors to complete the jury.

¶ 51        While the jury selection procedure the court utilized here may have varied the express requirement of N.C. Gen. Stat. § 15A-1214(d) requiring the State to pass a full panel of twelve prospective jurors, Defendant cannot show reversible prejudice to award a new trial. Defendant questioned and accepted juror White, without objection, who he now asserts he possibly would have excluded. Defendant failed to exhaust his pre-emptory challenges and did not move for the removal of juror White for cause. Defendant was not forced to accept any undesirable juror as a result of the passing of less than twelve prospective jurors during jury selection procedure under

these circumstances. *Lawrence*, 352 N.C. at 13, 530 S.E.2d at 815 (citing N.C. Gen. Stat. § 15A-1443(c) (1999); *State v. Miller*, 339 N.C. 663, 681, 455 S.E.2d 137, 147, *cert. denied*, 516 U.S. 893, 133 L.Ed.2d 169 (1995); *State v. Fletcher*, 348 N.C. 292, 312, 500 S.E.2d 668, 680 (1998), *cert. denied*, 525 U.S. 1180, 143 L.Ed.2d 113 (1999)). To any extent Defendant's argument is not waived, no prejudice is shown. Defendant's argument is overruled.

### VII. Admission of State's Exhibits 54, 55, and 57

¶ 52 Defendant argues the trial court erred by admitting the State's Exhibits 54, 55, and 57 over his objections. The State's Exhibit 54 is a copy of Facebook social media messages between Defendant's and Blount's sisters, Spence and Ashley. In the 13 August 2017 message from Ashley to Spence, she was trying to reach Blount because he had allegedly sold her brother a gun for $260, did not deliver the firearm, and had allegedly made "off with the money." Ashley also messaged Spence asserting Blount had "better cough up $260," and if her brother saw Blount there would be a fight.

¶ 53 State's Exhibit 55 is a copy of Facebook messages between Spence and decedent Blount. In the message Spence informed her brother, Blount, that Ashley was looking for him. Spence told Blount that Ashley had asserted Blount was supposed to have sold a gun to her brother, but had taken the money and did not deliver the weapon.

¶ 54    State's Exhibit 57 is documentation of Ashley's handgun purchase of a .40 caliber Smith and Wesson handgun.  Ashley applied for and was granted a handgun permit on 8 March 2018.  She purchased a .40 caliber Smith and Wesson handgun on 30 March 2019.

### C.  Relevance

¶ 55    Defendant argues the admission of this evidence was irrelevant under North Carolina Rules of Evidence 401 and 402.  N.C. Gen. Stat. § 8C-1, Rules 401, 402 (2021).

¶ 56    Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."  N.C. Gen. Stat. § 8C-1, Rule 401.  Irrelevant evidence is evidence "having no tendency to prove a fact at issue in the case."  *State v. Hart*, 105 N.C. App. 542, 548, 414 S.E.2d 364, 368, *disc. review denied*, 332 N.C. 348, 421 S.E.2d 157 (1992).  Under Rule 402, relevant evidence is generally admissible at trial, while irrelevant evidence is inadmissible.  *See* N.C. Gen. Stat. § 8C-1, Rule 402.

### 1.  Standard of Review

¶ 57    "Although a trial court's rulings on relevancy are not discretionary and we do not review them for an abuse of discretion, we give them great deference on appeal."  *State v. Grant*, 178 N.C. App. 565, 573, 632 S.E.2d 258, 265 (2006) (citation omitted),

*disc review denied*, 361 N.C. 223, 642 S.E.2d 712 (2007).

### 2. *Analysis*

¶ 58 Defendant asserts the statements made by Ashley in her Facebook messages were not relevant because it was not clear whether Ashley meant Defendant when she referenced her "brother." The evidence produced shows Ashley has three brothers: Defendant, Dataveus White, and Dustin Hartley. Defendant maintains the testimony was without proper foundation and irrelevant regarding Ashley's contact with Spence under Rules 401 and 402.

¶ 59 Defendant's argument is misplaced, Spence's testimony showed she was unaware of Ashley having any brothers other than Defendant. Spence testified she understood Ashley to mean Defendant in the messages. Defendant's objections to relevancy to Exhibits 54 and 55 were properly overruled.

¶ 60 Defendant further argues the trial court erred in allowing documents showing Ashley's purchase of a Smith and Wesson .40 caliber handgun on 30 March 2018 into evidence. Our Supreme Court has long held: "in criminal cases, every circumstance that is calculated to throw any light upon the supposed crime is admissible." *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965). The .40 caliber handgun Ashley purchased was the same caliber as the shell casings recovered at the scene and recovered from Blount's body. Defendant's objections to relevancy to admission of Exhibit 57 was properly overruled.

¶ 61    The challenged testimony and exhibits were clearly relevant under Rules 401

and 402.  They were probative to issues of Defendant's guilt, Defendant's opportunity

to acquire a weapon, and Defendant's possible motive for the killing.  Defendant has

failed to show Spence's testimony and the exhibits at issue are irrelevant and

inadmissible under Rules 401 and 402.  N.C. Gen. Stat. § 8C-1, Rules 401, 402.

## D. Hearsay

¶ 62    Defendant argues the trial court erred in admitting the State's Exhibit 54 over

his hearsay objections and  admitting Ashley's statements in Exhibit 54 into evidence

under Rule 804.  N.C. Gen. Stat. § 8C-1, Rule 804 (2021).  In ruling on Defendant's

objections the trial court found:

> The Court further finds that the witness was a participant
> in the conversation, the online conversation, and as such,
> read and saw the things that were being said
> contemporaneously with the publication, that the State
> will be bound by the requirement that they lay the
> appropriate foundation with regard to identification of the
> fact that Ms. Ashley was a participant in this conversation
> and how the witness knew her.  Subject to laying the
> appropriate foundation, the Court is going to find that the
> post of Kimberly Ashley is admissible.
>
> With regard to the Facebook messages of Trevon Blount,
> the Court is going to make the same findings.  Further, the
> Court is going to find that the messages to Trevon Blount
> indicate further the fact that the witness, Britney Spence,
> believed the threats to be true that were communicated,
> and communicated them to Mr. Blount, which gives it some
> indicia of reliability.  Mr. Blount is deceased, therefore he
> cannot be called as a witness.  He is therefore unavailable

under Rule 804. The Court is going to find that, subject to the proper foundation, that those Facebook messages are admissible as well, and that they are relevant to establish or make more likely facts at issue in this case.

The trial court later stated: "I think I found that Spence was not hearsay, the one was hearsay, subject to exception under 804, is what I found." Defendant does not challenge Spence's conversation with Blount that is contained in Exhibit 55 on appeal.

### 1. *Standard of Review*

This Court reviews a trial court's ruling on the admission of evidence over a party's hearsay objection *de novo*. *State v. Miller*, 197 N.C. App. 78, 87-88, 676 S.E.2d 546, 552, *disc review denied*, 363 N.C. 586, 683 S.E.2d 216 (2009). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citations and internal quotation marks omitted).

### 2. *Analysis*

Our North Carolina Rules of Evidence provide: "Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered into evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801 (2021). Hearsay is inadmissible except as provided by the statutes or by the rules of evidence. N.C. Gen. Stat. § 8C-1, Rules 802 (2021).

"The erroneous admission of hearsay testimony is not always so prejudicial as

to require a new trial, and the burden is on the defendant to show prejudice." *State v. Allen*, 127 N.C. App. 182, 186, 488 S.E.2d 294, 297 (1997) (citations omitted); *see* N.C. Gen. Stat. § 15A-1443(a) (2021). Prejudicial errors occur when there is a reasonable possibility that a different result would have been reached, had the error not been committed. *Allen*, 127 N.C. App. at 186, 488 S.E.2d at 297.

¶ 67        Our Supreme Court has stated: "The law permits declarations of one person to be admitted into evidence for the purpose of showing that another person has knowledge or notice of the declared facts and to demonstrate his particular state of mind." *State v. Swift*, 290 N.C. 383, 393, 226 S.E.2d 652, 661 (1976). The statement was offered to show the effect and impact of Ashley's messages on Spence and on Blount. Presuming, without deciding, this conversation was inadmissible hearsay, Defendant cannot demonstrate any prejudice. The trial court did not err as a matter of law in admitting State's Exhibit 54 into evidence. Defendant's argument is overruled.

## VIII.    Conclusion

¶ 68        We hold the trial court had subject matter jurisdiction to try Defendant. We find no prejudicial error in the trial court's denial of his motion for a continuance, the alleged exclusion of Defendant's father from the courtroom, the variance in the jury selection and procedure, and the admission into evidence of State's Exhibits 54, 55, and 57.

Defendant received a fair trial, free from prejudicial errors he preserved and argued. Our review shows no error in the jury's verdict or in the judgment entered thereon. *It is so ordered.*

NO ERROR.

Judges CARPENTER and WOOD concur.